[Civ. No. 14968. Fourth Dist., Div. One. May 30, 1979.]

CYNTHIA MARIE DELOS et al.,
Plaintiffs and Appellants, v.
FARMERS INSURANCE GROUP et al.,
Defendants and Appellants.

646

**COUNSEL**

Tyson & Churchill, Gordon S. Churchill, William M. Shernoff, Kenneth C. Blickenstaff, Popko & Cornblum, Greer, Popko, Cornblum & Miller, Popko, Cornblum, Miller & Eddy and Bruce I. Cornblum for Plaintiffs and Appellants.

McInnis, Fitzgerald, Rees & Sharkey, James A. McIntyre, Horvitz, Greines & Poster, Ellis J. Horvitz, Arthur E. Schwimmer, Barry R. Levy and John L. Klein for Defendants and Appellants.

## OPINION

**WIENER, J.**—We face in this appeal a variation on a popular and recurring theme—punitive damages in a "bad faith" case relating to uninsured motorist coverage. We decide plaintiffs are entitled to compensatory and punitive damages, rejecting defendants' several arguments and conclude further it was not an abuse of discretion for the trial court to grant a new trial unless plaintiffs consented to $350,000, a reduction from the $4 million jury award.

*Procedural Background*

Cynthia Marie and Timothy Delos (the Deloses) sued Farmers Insurance Exchange (the Exchange) and Farmers Insurance Group (the Group) for compensatory and punitive damages for the failure of defendants to recognize and pay the uninsured motorist (UM) claim of Mrs. Delos in accordance with the terms of her automobile insurance policy issued by the Exchange. The pleadings of plaintiffs' second amended complaint filed February 21, 1975 were based on breach of the implied duty of good faith and fair dealing, constructive and actual fraud, and violation of the statutory duties defined in Insurance Code section 790.03.[1]

The jury rendered a verdict in favor of plaintiffs against the Exchange for $2,500 and against the Group for $8,000 compensatory damages and $4 million punitive damages. The Exchange moved for a new trial; the Group moved for judgment notwithstanding the verdict and/or for a new trial. All motions were denied except the Group's motion for a new trial on the issue of punitive damages only unless the Deloses consented to a reduction of punitive damages to $350,000. The Exchange and the Group appeal from the judgment entered pursuant to the jury verdict (Code Civ. Proc., § 904.1, subd. (a)). The Group also appeals from the denial of its motion for judgment notwithstanding the verdict (Code Civ. Proc.,

---

[1]An action for declaratory relief against the Exchange only was filed on November 27, 1973. A first amended complaint which included the theories of bad faith and fraud and which added the Group as a defendant was filed on April 24, 1974.

§ 904.1, subd. (d)). The Deloses cross-appeal from the order granting the Group a new trial (Code Civ. Proc., § 904.1, subd. (d)).

*Factual Background*

We believe it helpful to set out the facts under three separate headings. The relationship between the insurance known as guaranteed benefits (GB) and the bad faith aspect of this litigation, although superficially appearing to be distinct events, have a nexus which we will fully discuss.

*Guaranteed Benefits*

In the early part of 1972, the Group considered developing for the Exchange an insurance coverage to be known as GB, a combination of high limits ($15,000 for one person/$30,000 for one accident), medical payments and disability income coverage designed to induce policyholders of the Exchange to give up their UM coverage. Management of the Group, aware of the substantial loss associated with UM coverage, desired some remedial action, for it knew UM coverage could not legally be dropped or rates sufficiently raised to make the line profitable. The marketing program for the coverage, as approved and implemented, required any policyholder desiring to buy GB to sign a form deleting UM, medical payments and auto disability coverage with no further explanation of the rights being relinquished.

The first written notice announcing the availability of the new coverage (stuffer No. 1) was sent out in July 1972, but was stopped within a few months after the California Insurance Commissioner and some of the Exchange's agents criticized the notice for not adequately advising prospective purchasers they were giving up UM coverage. Starting in October 1972, a revised notice (stuffer No. 2) was sent to policyholders whose policies came up for renewal during the six-month period starting October 1, 1972. Stuffer No. 2 contained a comparison of GB and UM coverage. A third revised notice (stuffer No. 3) was mailed for a limited time after March 1973 following an injunction restraining the mailing of the first two stuffers.

*The Purchase of GB by the Deloses*

Mrs. Delos handled insurance matters for her family. When she read stuffer No. 2, she concluded GB was an additional coverage. She then checked a box on the renewal payment card—"Change coverage to

Guaranteed Benefits"—and returned it to the Exchange with her check for the renewal premium. Neither she nor her husband had any desire to give up UM coverage; neither one signed the waiver attached to the stuffer.

When the renewal policy was received, Mr. Delos discovered the declarations page said something other than "not covered" with respect to UM coverage. It contained the word "See" in the UM box, ostensibly to draw his attention to the GB indorsement (E-387). The indorsement, however, although expressly providing for the deletion of the medical expense provision of the Delos policy and describing the benefits under the added coverage, made no reference to UM coverage.

*The UM Claim of Mrs. Delos*

Mrs. Delos was injured on May 25, 1973 when she was involved in an automobile accident caused by an uninsured motorist. Her automobile insurance policy with the Exchange included UM and GB coverage.

Plaintiffs reported the accident by telephone on May 30, 1973, to the San Diego branch claims office. Kenneth P. Flaherty, a claims supervisor in that office, reviewed the insurance information pertaining to the Deloses and concluded that since they had bought GB coverage during the period it was necessary to waive UM coverage, they did not have the latter coverage and so advised the claims adjuster assigned to the file. Consequently, on June 7, 8 and 14, 1973, Mr. and Mrs. Delos and their counsel were advised by the Exchange that her lost wages and medical expenses were covered by GB, but there was no UM coverage.

On December 5, 1973, plaintiffs' counsel sent a written request to the Exchange for arbitration of the UM claim. Plaintiffs' written requests to the Exchange for arbitration and for a copy of the written waiver of UM coverage made on February 5, March 7, April 1 and 17, were unanswered. On April 11, 1974, the regional office of the Exchange wrote to the San Diego branch claims office explaining that plaintiffs' UM waiver could not be located. The waiver forms were kept at the Santa Ana regional office. During 1972-1973, the procedure at the regional office was that, after the information from the waiver forms was put into a computer, the programmers would drop each waiver into a large, polyethylene bag next to the computer terminal. Some of the waivers missed the bags, dropped on the floor, and were swept away by the janitorial staff. Those waivers which fell into the bags were stored without

being sorted as to policy number or name of insured. A claims examiner told Mrs. Delos' counsel on or about April 18 that if the waiver could not be located, the Exchange would settle her UM claim and on April 23, 1974, Mr. Flaherty wrote to Mrs. Delos' counsel to the same effect. Plaintiffs' counsel responded by offering to drop their lawsuit if the Exchange unequivocally extended UM coverage and paid plaintiffs' attorney fees. The Exchange failed to respond.

On May 9, 1974, the regional office advised the San Diego claims office it was unable to locate the UM waiver. A few days later, the supervisor of liability claims and the branch claims office manager jointly sent a memo to the regional claims manager, who agreed the Exchange had no choice but to extend UM coverage. Nevertheless, the Exchange decided to defer its decision on UM coverage until Mrs. Delos' deposition was taken. When her deposition was eventually taken on October 24, 1974, the Exchange agreed to recognize her UM claim.

### THE GROUP'S APPEAL[2]

*The Trial Court Properly Denied the Group's Motion for Judgment Notwithstanding the Verdict*

The Group attacks the denial of its motion for judgment notwithstanding the verdict on the ground that the law and the evidence compelled a finding in its favor on each of plaintiffs' five causes of action. We address only two of plaintiffs' theories of relief, for where there are several causes of action a general verdict will be upheld if the evidence supports it on any one count. (*Henderson v. Harnischfeger Corp.* (1974) 12 Cal.3d 663, 673 [117 Cal.Rptr. 1, 527 P.2d 353].)

*The Group Is Liable on the Theory of Breach of the Implied Covenant of Good Faith and Fair Dealing on the Insurance Contract*

■ It is now well settled that an insurer has the law-imposed duty to act fairly and in good faith in discharging its contractual responsibilities to its insured. (See *Comunale v. Traders & General Ins. Co.* (1958) 50 Cal.2d 654 [328 P.2d 198, 68 A.L.R.2d 883]; *Crisci v. Security Ins. Co.* (1967) 66 Cal.2d 425 [58 Cal.Rptr. 13, 426 P.2d 173].) The source of that duty is the implied covenant that neither party will do anything that will injure the right of the other to receive the benefits of the agreement.

---

[2]Reference is made to footnotes 7 and 8, *infra,* for our resolution of the Exchange's appeal.

(*Brown* v. *Superior Court* (1949) 34 Cal.2d 559, 564 [212 P.2d 878].) As part of its obligation, an insurer must act fairly and in good faith in handling claims submitted by its insured—"a duty not to withhold unreasonably payments due under a policy." (*Gruenberg* v. *Aetna Ins. Co.* (1973) 9 Cal.3d 566, 573 [108 Cal.Rptr. 480, 510 P.2d 1032].) The Exchange admittedly had the duty to handle the UM claim of Mrs. Delos in the manner required by law. (*Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 921 [148 Cal.Rptr. 389, 582 P.2d 980].) It acknowledges in this appeal that there was sufficient evidence in reference to its denial of plaintiffs' claim to support a finding of breach of the covenant of good faith and fair dealing, and the general verdict against it may therefore be upheld on the "bad faith" count. The Group contends, however, that since it was not a party to the insurance contract, it may not be liable for "bad faith," relying upon *Gruenberg* v. *Aetna Ins. Co., supra,* 9 Cal.3d at page 576; *Iversen* v. *Superior Court* (1976) 57 Cal.App.3d 168 [127 Cal.Rptr. 49]; and *Hale* v. *Farmers Ins. Exch.* (1974) 42 Cal.App.3d 681, 702 [117 Cal.Rptr. 146].

In *Gruenberg,* our Supreme Court held the insurance adjusting firm, the law firm, their respective employees and the agents and employees of the defendant insurers were not subject to the implied covenant since they were "total strangers to the contracts of insurance," who became involved after the occurrence of the loss and claim. (*Gruenberg* v. *Aetna Ins. Co., supra,* 9 Cal.3d at p. 576.) In *Iversen,* there were no affidavits or declarations filed by plaintiff in opposition to Iversen's motion for summary judgment in which the defendant declared he was not a party to the insurance contract and had no part in the selling or underwriting of the insurance. On the basis of *Gruenberg,* the motion for summary judgment was granted. In *Hale,* the majority, with grudging obeisance to *Gruenberg,* reversed a judgment against a claims supervisor and claims examiner.

Our factual and legal matrix is far different. The Group has aptly described itself in this appeal as the management organization for the Exchange. At trial, Parke Godwin, a vice president of the Group, explained the relationship between an inter-insurance exchange and its attorney-in-fact. As an inter-insurance or reciprocal exchange, the Exchange consists of its policyholders who insure one another. He said: "[I]f it were small enough, they [the policyholders] would just get together from time to time and put money in a big barrel and take the money out of the big barrel for claims purposes. Since it is three and a half, four million people, it is not practical. A management company or an

attorney-in-fact is appointed to handle all of those monetary and other affairs to see that the property is properly accepted and properly disbursed and properly accounted for." In order to effectuate this relationship, every policyholder of the Exchange was required to appoint the Group as attorney-in-fact.

The relationship between an inter-insurance exchange and its attorney-in-fact was more formally described in *Industrial Indem. Co.* v. *Golden State Co.* (1953) 117 Cal.App.2d 519, 522-523 [256 P.2d 677]: "A reciprocal insurance exchange, regulated in sections 1280-1530 of the Insurance Code, is an unincorporated business organization of a special character in which the participants, called subscribers (or underwriters) are both insurers and insureds; for their mutual protection, they exchange insurance contracts through the medium of an attorney-in-fact, empowered in each underwriters agreement not only to exchange insurance contracts for the subscribers, but also to exercise *all* other functions of an insurer, e.g., to set rates, to settle losses, to compromise claims, to cancel contracts. The subscribers furnish by their premium deposits, the means required for losses and costs, reserves and surpluses of the reciprocal insurance of them all, and therefore are entitled to the equity in the assets of the Exchange subject to the purpose for which they have furnished said means. If the amount of premiums deposited is not fully required for the purposes mentioned, the excess, called savings, is returned in whole or in part as dividends. The attorney-in-fact receives a sizable percentage of the premiums deposited in consideration of which he does not only provide his own services, but also has to defray many of the costs of the business." (Italics supplied.)

In summary, for legitimate business considerations, the Group was formed to render management services for the Exchange for which it received a percentage of premiums paid by the Exchange's policyholders.

If we were to accept the Group's argument and adhere to the general rule that "bad faith" liability may be imposed only against a party to an insurance contract, we would not only permit the insurer to insulate itself from liability by the simple technique of forming a management company, but we would also deprive a plaintiff from redress against the party primarily responsible for damages. We conclude the Group is liable for the breach of the implied covenant of good faith and fair dealing. We are not persuaded to a different result by the Group's reference to Insurance Code sections 1303 and 1305, where a distinction for certain purposes is made between an insurer and attorney-in-fact. To the

contrary, our consideration of the Insurance Code and its regulation of persons engaged in the insurance business (Ins. Code, § 790.01) and attorneys-in-fact (Ins. Code, § 1281) supports our conclusion.[3]

■ *The Group Was Engaged in the Business of Insurance and It May Be Held Liable Under Insurance Code Section 790.03*

Plaintiffs' second amended complaint included a cause of action against the Group based upon conduct prohibited by Insurance Code section 790.03, subdivisions (a) through (h). The Group asserts liability may not be imposed against it under the provisions of the Insurance Code because it neither engaged in the insurance business, a requirement of Insurance Code section 790.03, nor denied the claim as part of a general business practice. We have previously stated that although there are distinctions in the Insurance Code between insurers and attorneys-in-fact, those distinctions are not germane to the issue of whether an attorney-in-fact for a reciprocal insurer, is engaged in the insurance business. It is difficult to reconcile the Group's admission that it is part of the insurance company's management hierarchy with its assertion that it is not engaged in the insurance business, particularly in light of Insurance Code section 1281, which expressly provides that attorneys-in-fact are covered by the Insurance Code.

The question as to whether a single instance of unfair conduct permits an action by a private party under Insurance Code section 790.03, subdivision (h), has been resolved adversely to the Group in *Royal Globe Insurance Co.* v. *Superior Court* (1979) 23 Cal.3d 880, 891 [153 Cal.Rptr. 842, 592 P.2d 329]: "[W]hile repetition of prohibited acts is relevant to the duty of the insurance commissioner to issue a cease and desist order, to an aggrieved private litigant who can demonstrate that the insurer acted deliberately, the frequency of the insurer's misconduct and its application to others is irrelevant. . . . [A] single violation knowingly committed is a sufficient basis for such an action."

The denial of the motion for judgment notwithstanding the verdict was proper. (*Quintal* v. *Laurel Grove Hospital* (1964) 62 Cal.2d 154, 159 [41 Cal.Rptr. 577, 397 P.2d 161].)

---

[3]The Group also contends there was insufficient evidence to tie it into the Exchange's denial of the Delos claim. We disagree. Although the claims personnel directly handling the Delos matter were employed by the Exchange, there was ample evidence from which the jury could have reasonably concluded the claim was processed in the manner established by Group management.

*The Jury Instructions Did Not Result in Prejudicial Error*

The Group contends prejudicial error occurred with reference to certain jury instructions. We summarily dispose of the Group's arguments as to those instructions which we conclude were not erroneous. Sufficient evidence was introduced on each of the elements of plaintiffs' fraud theories to warrant the fraud instructions which were given. The instructions which included the Group as a party which could be liable for unfair insurance practices (Ins. Code, § 790.03) or for failing to deal fairly and in good faith, were also proper.

■ It was also not error for the trial court to refuse to give an additional cautionary instruction on punitive damages. The jury did not have unbridled discretion to award punitive damages. It was expressly told that if it should decide to award punitive damages, its discretion should be exercised without passion or prejudice.

■ Preliminary to our examination of the other jury instructions claimed to be erroneous, we note our standard of review. The giving of an improper instruction is not necessarily grounds for reversal. All jury instructions must be read together and, if construed as a whole and they state the law fairly, the charge to the jury is proper. (See 4 Witkin, Cal. Procedure (2d ed. 1971) Trial, §§ 242-245, pp. 3056-3059.) Reversal is required only where it seems probable that the jury's verdict may have been based upon the erroneous instruction. (*Robinson* v. *Cable* (1961) 55 Cal.2d 425, 428 [11 Cal.Rptr. 377, 359 P.2d 929].)

"[I]n determining whether or not a verdict is supported by the evidence, we must assume that the jury accepted the view most favorable to the respondent. However, in determining whether or not the instructions given are correct, we must assume that the jury might have believed the evidence upon which the instruction favorable to the losing party was predicated, and that if the correct instruction had been given upon that subject the jury might have rendered a verdict in favor of the losing party." (*O'Meara* v. *Swortfiguer* (1923) 191 Cal. 12, 15 [214 P. 975]; see also *Oettinger* v. *Stewart* (1944) 24 Cal.2d 133, 140 [148 P.2d 19, 156 A.L.R. 1221]; *Henderson* v. *Harnischfeger Corp., supra,* 12 Cal.3d 663, 674.) Consequently, it is necessary to examine the entire record including all the instructions given to determine whether the probable effect of the instruction was to mislead the jury. (*Krouse* v. *Graham* (1977) 19 Cal.3d 59, 72 [137 Cal.Rptr. 863, 562 P.2d 1022].)

"While there is no precise formula for measuring the effect of an erroneous instruction [citation], a number of factors are considered in measuring prejudice: (1) the degree of conflict in the evidence on critical issues [citations]; (2) whether respondent's argument to the jury may have contributed to the instruction's misleading effect [citation]; (3) whether the jury requested a rereading of the erroneous instruction [citation] or of related evidence [citation]; (4) the closeness of the jury's verdict [citation]; and (5) the effect of other instructions in remedying the error [citations]." (*LeMons* v. *Regents of University of California* (1978) 21 Cal.3d 869, 876 [148 Cal.Rptr. 355, 582 P.2d 946].)

The Group draws our attention to other instructions which we agree were at least partially incorrect. However, upon application of the foregoing criteria, we conclude the error was harmless.

The first instruction, erroneous in part, was the following:

"With respect to the charge of fraud where, as here, a fiduciary relationship is established between plaintiffs and defendants, the plaintiffs do not have the burden of proving fraud, but rather the defendants have the burden of establishing by a preponderance of the evidence all of the facts necessary to prove the following issues:

"1. That they exercised the utmost good faith toward plaintiffs with respect to the program offering Guaranteed Benefits.

"2. That they were not guilty of fraud, either actual or constructive."

The Group asserts the instruction reversing the burden of proof was based on an erroneous decision by the trial court that the defendants had a fiduciary relationship to the plaintiffs. ■ The determination by the trial court of the fiduciary relationship was correct. It was based upon the defendants' failure to answer requests for admissions which asked each defendant to admit that a fiduciary duty existed between plaintiffs and defendants. (Code Civ. Proc., § 2030, subd. (e).) In addition to the procedural basis for this conclusion, the Group, as plaintiffs' attorney-in-fact, owed them a fiduciary duty in reference to insurance matters involving the Exchange. An attorney-in-fact is simply an agent acting under a written grant of authority. (*Frink* v. *Roe* (1886) 70 Cal. 296, 307 [11 P. 820].) As an agent, the attorney-in-fact has fiduciary responsibilities. (*Twomey* v. *Mitchum, Jones & Templeton, Inc.* (1968) 262 Cal.App.2d

690, 709 [69 Cal.Rptr. 222]; Civ. Code, § 2322, subd. 3; Rest., Agency, § 13.)

The use of the word "utmost" to describe the good faith required was not error. In another instruction which defined the duty of good faith and fair dealing necessary for the proper handling of plaintiffs' UM claim, the word "utmost" was omitted. Although judicial opinions are not written as jury instructions and may be notoriously unreliable as such (*Merritt* v. *Reserve Ins. Co.* (1973) 34 Cal.App.3d 858, 876, fn. 5 [110 Cal.Rptr. 511]), we also note "utmost" has been used in cases defining the requisite standard of good faith. (See *Stevens* v. *Marco* (1956) 147 Cal.App.2d 357, 373 [305 P.2d 669]; *Nelson* v. *Abraham* (1947) 29 Cal.2d 745, 751 [177 P.2d 931].)

■ A fiduciary relationship did exist between plaintiffs and defendants and, because of that relationship, the burden of proof partially shifted to defendants. (Civ. Code, § 2235; *Hicks* v. *Clayton* (1977) 67 Cal.App.3d 251, 262 [136 Cal.Rptr. 512]; *Rebmann* v. *Major* (1970) 5 Cal.App.3d 684, 688 [85 Cal.Rptr. 399]; Evid. Code, §§ 605, 606.) We agree with defendants the burden of proof was shifted only as to constructive fraud and not actual fraud. The burden of proof remained with plaintiffs to establish actual fraud by a preponderance of the evidence. (*Liodas* v. *Sahadi* (1977) 19 Cal.3d 278, 291-292 [137 Cal.Rptr. 635, 562 P.2d 316].)

■ We also agree with the Group it was erroneous to instruct the jury it could award punitive damages based solely on a finding of negligent misrepresentation or constructive fraud.[4] Punitive damages are not recoverable for negligent misrepresentation. (*Tri-Delta Engineering, Inc.* v. *Insurance Co. of North America* (1978) 80 Cal.App.3d 752, 759 [146 Cal.Rptr. 14]; *Ebaugh* v. *Rabkin* (1972) 22 Cal.App.3d 891, 894 [99 Cal.Rptr. 706].) A breach of a fiduciary duty alone without malice, fraud

---

[4]This result came about in the following manner: The jury was twice instructed on the issue of punitive damages. The first time, it was told it could award punitive damages if it found either defendant "has been guilty of oppression, *actual* fraud, or actual malice." The jury was further instructed "actual fraud has already been defined for you in previous instructions." Thereafter, in an attempt to "correct" this instruction, the trial court told the jury it could award punitive damages if it found either defendant "has been guilty of oppression, fraud or actual malice." The jury was then told "fraud has already been defined for you in the previous instructions." Thus both of the instructions on punitive damages refer to earlier instructions defining fraud which included constructive fraud and negligent misrepresentation. (See Civ. Code, § 1572, subd. 2, § 1710, subd. 2.)

or oppression does not permit an award of punitive damages. *(Security First National Bank of Los Angeles* v. *Lutz* (9th Cir. 1961) 297 F.2d 159, 165; *Franklin Supply Co.* v. *Tolman* (9th Cir. 1972) 454 F.2d 1059, 1074-1075.) In cases sanctioning punitive damages where there has been a breach of fiduciary responsibility, there has also been oppression, malice or fraud *(Sequoia Vacuum Systems* v. *Stransky* (1964) 229 Cal.App.2d 281, 288 [40 Cal.Rptr. 203]; *Devers* v. *Greenwood* (1956) 139 Cal.App.2d 345, 350 [293 P.2d 834]), or behavior reflecting a callous disregard of plaintiffs' rights where the conduct was substantially certain to vex, annoy or injure *(Vale* v. *Union Bank* (1979) 88 Cal.App.3d 330, 340 [151 Cal.Rptr. 784]) sufficient to base the punitive damage award.

As stated previously, our review of error in reference to jury instructions cannot properly be made in the abstract. It is essential to examine the error in light of the realities of the trial and to keep in mind the collective talents of jurors to understand and apply the cram course in torts contained in the instructions. Although it has been suggested that jurors truly do not understand the legal jargon of jury instructions (see, e.g., *Werkman* v. *Howard Zink Corp.* (1950) 97 Cal.App.2d 418, 428 [218 P.2d 43], conc. opn. of Shinn, P. J.), relying instead on their sense of justice, we believe this comment, whether deemed a criticism or compliment, underestimates the conscientiousness and capability of a jury. The jury in this case deliberated two full days, requested a reading of certain instructions, including the instructions which we have found to be erroneous, and reached their verdict in an 11-to-1 vote.

Plaintiffs' counsel did not dwell on the constructive fraud as a basis for punitive damages either during trial or in argument. In an effort to maximize the award of exemplary damages, counsel concentrated on the Group's conduct in what he described as a "scheme" which was "hatched" by the Group—whatever happened after the scheme "was merely a manifestation of their fraudulent intent." He urged that ". . . if punitive damages should be given in this case, it more likely should be given against Group, Inc. where all the management people are who thought up these plans."

It does not require speculation to conclude on what basis the jury reached its verdict where the punitive damage award was assessed solely against the Group. If constructive fraud were the basis for the award of punitive damages, the Exchange also would have been included. Proper instructions on the burden of proof as to punitive damages and on actual

fraud were given. The verdict reflects the acceptance by 11 jurors of plaintiffs' argument as to the culpability of the Group in creating and implementing a program which they felt was morally reprehensible, justifying a substantial economic sanction.

### The Court's Evidentiary Rulings Were Within Its Discretion

■ The Group asserts that evidence of defendants' conduct which occurred before and after the transactions involving plaintiffs should have been excluded by the trial court because the prejudicial effect of the evidence outweighed its probative value. (Evid. Code, § 352, subd. (b).) The evidence was relevant "[s]ince direct proof of fraudulent intent is often impossible, the intent may be established by reference from acts of the parties." (*Santoro* v. *Carbone* (1972) 22 Cal.App.3d 721, 727 [99 Cal.Rptr. 488].) The jury was told during trial that the evidence was being admitted for a limited purpose and instructed at the conclusion of the case in accordance with a special instruction submitted by defendants that the evidence was restricted solely to the issue of defendants' intention. We conclude the trial court did not abuse its discretion in admitting the evidence for the materiality of the evidence on a central issue of the case outweighed its prejudicial effect. (See Jefferson, Cal. Evidence Benchbook (1972 ed.) Principles of Relevancy, § 22.1, pp. 287-294.)

### ■ The Group's Motion for a Directed Verdict Against Mr. Delos Was Properly Denied

After both sides had rested, the Group argued that Mrs. Delos, as the only insured who was injured by the uninsured motorist, was the only person who had a claim against defendants for damages and that Mr. Delos' claim for emotional distress should not be presented to the jury. The trial court denied the motion for directed verdict. We conclude the trial court ruled correctly.

We have previously discussed the insurer's liability in tort for the breach of the implied-in-law duty to act fairly and in good faith toward its insured. The unreasonable and bad faith refusal of an insurer to pay a valid claim of its insured gives rise to the insurer's liability for all economic loss of the insured as well as consequential emotional distress. (*Silberg* v. *California Life Ins. Co.* (1974) 11 Cal.3d 452, 460-461 [113

Cal.Rptr. 711, 521 P.2d 1103]; *Gruenberg* v. *Aetna Ins. Co., supra,* 9 Cal.3d 566, 573-575; *Fletcher* v. *Western National Life Ins. Co.* (1970) 10 Cal.App.3d 376, 401-402 [89 Cal.Rptr. 78, 47 A.L.R.3d 286].) There are no public policy or doctrinal considerations that preclude Mr. Delos from having an independent cause of action against defendants. He was a party to the insurance contract and the effect upon him of the improper denial of his wife's claim was reasonably foreseeable. (Cf. *Austero* v. *National Cas. Co.* (1976) 62 Cal.App.3d 511, 516-517 [133 Cal.Rptr. 107].) It certainly can be expected that when a husband or wife is injured in an uninsured motorist accident and the claim for that accident is wrongfully denied by their insurer, both husband and wife will incur expenses not necessarily limited to attorney fees, and that each may suffer varying degrees of emotional distress. Evidence that plaintiffs had expended $850 of their community funds for attorney fees to prosecute their claim was uncontradicted. Both Mr. and Mrs. Delos have liability for the substantial amount of legal costs incurred depending on the outcome of this litigation.[5] Although plaintiffs' counsel conceded in closing argument there was not a great deal of evidence on mental distress, it has not been suggested that Mr. Delos' claim was fictitious. When we balance the interests of Mr. Delos to receive all the benefits of his insurance policy including the protection of UM coverage against the right of an insurer to be free from fraudulent claims for emotional distress, we are satisfied that his financial loss is adequate to establish the genuineness of his claim for mental distress. (*Jarchow* v. *Transamerica Title Ins. Co.* (1975) 48 Cal.App.3d 917, 936-937 [122 Cal.Rptr. 470]; *Crisci* v. *Security Ins. Co., supra,* 66 Cal.2d 425, 434; *Gruenberg* v. *Aetna Ins. Co., supra,* 9 Cal.3d 566, 579-580.) There was sufficient evidence in the record to support a verdict against defendants to warrant the denial of the motion. (*Dailey* v. *Los Angeles Unified Sch. Dist.* (1970) 2 Cal.3d 741, 745 [87 Cal.Rptr. 376, 470 P.2d 360].)

Mr. Delos also sued for damages because defendants failed to comply with the requirements of Insurance Code section 790.03. Although the specific issue was not addressed in *Royal Globe Insurance Co.* v. *Superior Court, supra,* 23 Cal.3d 880, our Supreme Court did not disapprove of plaintiff's husband seeking damages for his loss of his wife's services and expenses which he had incurred as a result of her

[5]In order to resolve the motion for directed verdict, plaintiffs' counsel offered to stipulate to dismiss Mr. Delos in exchange for defendants' agreement not to seek costs against him. Defendants' counsel refused the offer. Mr. Delos thus remains liable for costs and continues to have an increasing contingent liability as this case proceeds through the appellate process.

injuries. (*Id.,* at p. 884, fn. 2.) There was also sufficient evidence on this issue to warrant the denial of defendant's motion for directed verdict.[6] [7]

### Different Verdicts Against the Group and the Exchange Do Not Require Reversal

The Group asserts there was no rational basis for the jury to apportion compensatory damages between two defendants; consequently, the judgments for different amounts against the defendants must be reversed for inconsistency. Defendant relies upon a line of authority starting with *McCool* v. *Mahoney* (1880) 54 Cal. 491, in which the court pronounced: "The judgment as entered is clearly erroneous. The action being for a wrong in which both defendants joined, the damages could not be severed." (*Id.,* at p. 493.) In *Marriott* v. *Williams* (1908) 152 Cal. 705, 711 [93 P. 875], the theme was repeated: "In actions against two or more persons for a single tort, there cannot be two verdicts for different sums against different defendants upon the same trial. There can be but one verdict for a single sum against all who are found guilty of the tort. All who are guilty at all are liable for the whole amount of the actual damages arising from the injury inflicted, irrespective of the degree of culpability." (See also *Oldham* v. *Aetna Ins. Co.* (1936) 17 Cal.App.2d 144 [61 P.2d 503]; *Mixon* v. *Riverview Hospital* (1967) 254 Cal.App.2d 364 [62 Cal.Rptr. 379].) In *American Motorcycle Assn.* v. *Superior Court* (1978) 20 Cal.3d 578 [146 Cal.Rptr. 182, 578 P.2d 899], our Supreme Court has altered this rule, declaring: "[W]hen two individuals are responsible for a loss, but one of the two is more culpable than the other, it is only fair that the more culpable party should bear a greater share of the loss." (*Id.,* at p. 593.) We now have as an operative rule in tort cases involving multiple defendants the rule of comparative indemnity based upon the common law doctrine of equitable indemnity. In light of the eradication of the intellectual underpinnings of the precedent to which we have been referred by the Group, we are not bound by the authority of those cases predating *Li* v. *Yellow Cab Co.*

---

[6]Even if we were to assume the motion for directed verdict as to Mr. Delos should have been granted, reversal of the judgments as requested by defendants is not required. "A general verdict implies a finding in favor of the prevailing party of every fact essential to the support of his action or defense. [Citations.] And all inferences and intendments favor such a verdict. [Citations.]" (4 Witkin, Cal. Procedure (2d ed. 1971) Trial, § 262, pp. 3072-3073.) Defendants did not request a form of special verdict to delineate the amount of damages for each plaintiff. When the jury was polled, defense counsel did not ask the jury to break down the damages into specific amounts for each plaintiff. Plaintiffs have never requested apportionment of the damages they were awarded. Since there is substantial evidence to support the award for compensatory damages in favor of Mrs. Delos alone, the judgments need not be reversed.

[7]We also reject the identical argument in the Exchange's appeal.

(1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393] and *American Motorcycle Assn.* v. *Superior Court, supra,* 20 Cal.3d 578.

The case at bench is also not one in which the verdict is "hopelessly ambiguous, hopelessly inconsistent or incomprehensible," requiring reversal. (*Mixon* v. *Riverview Hospital, supra,* 254 Cal.App.2d 364, 375.) The Group neither contends the total sum of $10,500 as compensatory damages is excessive, nor the division of those damages is inequitable. It relies solely upon precedent to argue that where the form of the division is unlawful, reversal is mandated. The Group, however, in pursuing this argument, overlooks the general rule that a verdict should be interpreted so as to uphold it and to have the trial or appellate court resolve apparent inconsistencies. (See 4 Witkin, Cal. Procedure (2d ed. 1971) Trial, § 282 et seq., pp. 3088-3098.) "Any and all reasonable inferences will be indulged in to support rather than defeat the verdict and judgment." (*Snodgrass* v. *Hand* (1934) 220 Cal. 446, 449 [31 P.2d 198].)

With the consent of the Group, six verdict forms were furnished to the jury. One of the forms had only a single space for damages against both defendants, thus requiring the jury to find against the defendants in the same amount. The jury decided to use two separate forms which permitted verdicts in different amounts against each defendant. Plaintiffs have never objected; no objection to the verdict forms was made by the Group at trial. Moreover, when the jury during their deliberations inquired whether different compensatory verdicts against each defendant were possible, defendants requested the jury be reinstructed. Counsel for all parties approved of the following modified instruction reread to the jury: "Each defendant is entitled to a fair and separate consideration of his own defense. The instructions governing the case as to each defendant insofar as they are applicable to him, unless otherwise stated, you will decide. You will decide each defendant's case separately." The jury obviously considered the evidence in accordance with the instructions given; the award of damages was consistent with their perception of the different degrees of responsibility and conduct of each defendant. Although jury verdicts in different sums may have surprised counsel, this unanticipated result cannot be equated with error.[8]

### PLAINTIFFS' CROSS-APPEAL

██ *The Conditional Order Granting the Motion for a New Trial Was Procedurally Adequate*

A specification of reasons describing in what respects the evidence dictated a lesser award is adequate when the trial judge "makes reference

---

[8]We also reject the identical argument in the Exchange's appeal.

to those aspects of the trial proceedings which, in the trial court's view, improperly led the jury to inflate its award." (*Neal* v. *Farmers Ins. Exchange, supra,* 21 Cal.3d 910, 932; *Stevens* v. *Parke, Davis & Co.* (1973) 9 Cal.3d 51, 62 [107 Cal.Rptr. 45, 507 P.2d 653].) The thorough letter prepared by the trial court summarizing the evidence, the issues and reasons for reducing the verdict, satisfied the provisions of Code of Civil Procedure section 657.[9]

[9]Part of the letter included the following discussion:

"With respect to the serious question of the punitive damages awarded it would appear that the amount is very high by any standard and certainly ranks among the highest awarded in this State. Several questions come to mind:

"1. Are punitive damages available in this case?

"2. How does the amount relate to the award of compensatory damages?

"3. How does the amount relate to the seriousness of the wrong done the plaintiffs?

"4. How does the amount relate to the status of the defendants?

"5. Is the relationship of the plaintiffs and defendants such that punitive damages will serve a useful purpose?

"The first question must be answered affirmatively. Punitive damages are available by pleading and proof of breach of a fiduciary relationship. Good faith dealings demand a high standard of conduct. The evidence is sufficient to suggest an undue and oppressive disregard of plaintiffs' status as policyholder claimants.

"The answer to the second question is that the award is astronomical in relation to the compensatory damages, recognizing however that this is a tenuous basis to employ in evaluating punitive awards.

"The answer to the third question presents some difficulty. If defendant Group's conduct is viewed as a nefarious scheme to mislead and defraud thousands of policyholders and that consideration may be taken into account, then the award does not seem unduly large. If, however, the facts are that the plaintiffs were not misled or defrauded and the thousands of policyholders are not parties to this proceeding, either directly or by representation, so that the comparison is on the basis of conduct toward plaintiffs alone, then the sum is in the area which shocks the conscience and leads to the conclusion the jury was misguided in the standards which it applied. Since I have indicated that plaintiffs have failed to prove reliance upon any representations made by defendant Group relative to the GB-UM coverages, it follows that the punitive damages should be awarded on a lesser scale.

"Measuring against the wealth and insurance world status of defendant Group, the answer to the fourth question is that the award is not inappropriate.

"The fifth question requires a consideration of the objective to be sought by the punitive award in this case. The proper objective would appear to be to induce better response to the claim of the individual assured, because what plaintiffs essentially have established here is a deficiency in recognizing a problem, acknowledging it and resolving it. Approximately two years elapsed from the accident to the payment of the UM coverage. It is practically impossible to justify that period of time in the circumstances of this case. The usual measure of damage for the non-payment of a sum owed is a calculation of interest. Admittedly insurance payments occupy a select role in the scheme of things. Unfair and unreasonable delay in the payment of insurance money demands more stringent tactics. Punitive damages are such a tactic. I am of the conclusion that plaintiffs' UM coverage claim problem had its inception not in the ulterior motives or devious planning of an insurance company hierarchy but in unforeseen mechanical circumstances which started when plaintiffs decided to *add* GB coverage at renewal time, and error compounded thereafter. The punitive damage award is in an amount appropriate to a class action or to a situation where substantial suffering and hardship on

*Standards for Appellate Review Governing Motions for New Trial*

Code of Civil Procedure section 657 provides: "[O]n appeal from an order granting a new trial . . . upon the ground of excessive . . . damages, it shall be conclusively presumed that said order as to such ground was made only for the reasons specified in said order or said specification of reasons, and such order shall be reversed as to such ground only if there is no substantial basis in the record for any of such reasons." On appeal, all presumptions are in favor of the new trial order as against the verdict and conflicts in the evidence must be resolved in favor of the order. (*Neal* v. *Farmers Ins. Exchange, supra,* 21 Cal.3d 910, 932-933.) An appellate court may reverse the order granting the new trial only when the reasons given by the trial judge reflect a manifest and unmistakable abuse of discretion. (See, e.g., *Weathers* v. *Kaiser Foundation Hospitals* (1971) 5 Cal.3d 98, 109 [95 Cal.Rptr. 516, 485 P.2d 1132].) "So long as a reasonable or even fairly debatable justification under the law is shown for the order granting a new trial, the order will not be set aside." (*Jiminez* v. *Sears, Roebuck & Co.* (1971) 4 Cal.3d 379, 387 [93 Cal.Rptr. 769, 482 P.2d 681, 52 A.L.R.3d 92].)

*There Was Sufficient Evidence to Support an Award of Punitive Damages. There Is a Substantial Basis in the Record for the Order Granting the Motion for New Trial*

The trial court's statement in its order granting a new trial that the evidence was ". . . sufficient to suggest undue and oppressive disregard of plaintiffs' status as policyholders claimants" is supported by the record and correctly states the law permitting an award of punitive damages in an appropriate bad faith case. (*Silberg* v. *California Life Ins. Co., supra,* 11 Cal.3d 452, 462; Civ. Code, § 3294.) The more difficult question is not plaintiffs' entitlement to punitive damages, but the amount of the award. In this regard, we are governed by certain principles defined in *Neal* v. *Farmers Ins. Exchange, supra,* 21 Cal.3d 910, 928: "One factor is the particular nature of the defendant's acts in light of the whole record; clearly, different acts may be of varying degrees of reprehensibility, and the more reprehensible the act, the greater the appropriate punishment,

---

the part of a plaintiff has been experienced. Here we have a young couple who were paid part of their money promptly but believed properly they were entitled to some more. They were upset, angry, disturbed, considered they were being pushed around, but with the fight being carried on by their counsel and no hardship shown. One can only conclude that the jury did not exercise a reasonable judgment and that the circumstances do not warrant the verdict rendered."

assuming all other factors are equal. [Citations.] Another relevant yardstick is the amount of compensatory damages awarded; in general, even an act of considerable reprehensibility will not be seen to justify a proportionally high amount of punitive damages if the actual harm suffered thereby is small. [Citation.] Also to be considered is the wealth of the particular defendant; obviously, the function of deterrence . . . will not be served if the wealth of the defendant allows him to absorb the award with little or no discomfort. [Citations.] By the same token, of course, the function of punitive damages is not served by an award which, in light of the defendant's wealth and the gravity of the particular act, exceeds the level necessary to properly punish and deter."

The trial court's decision to reduce the $4 million jury verdict was based on (1) defendants' scheme to mislead and defraud thousands of policyholders inherent in the GB program had no relation to plaintiffs; (2) the relationship of compensatory to punitive damages; and (3) the effect of defendants' conduct on plaintiffs must be separated from the possible effect on other policyholders. We examine each reason separately.

We find no substantial basis for the conclusion that the GB program was unrelated to plaintiffs. Even if we ignore plaintiffs' fraud causes of action and restrict our inquiry to defendants' conduct in reference to plaintiffs' claim of bad faith, we find an inextricable involvement with conduct aptly described by the trial court as a "nefarious scheme to mislead and defraud thousands of policyholders" with defendants' decision to deny Mrs. Delos' claim.

The GB program was designed to unfairly deprive the Exchange's policyholders of UM coverage, a coverage required by statute to be included in every bodily injury liability automobile policy issued or delivered in this state. (Ins. Code, § 11580.2.) UM coverage is within a ". . . pattern of statutes which are 'designed to give monetary protection to that ever changing and tragically large group of persons who while lawfully using the highways themselves suffer great injury through the negligent use of those highways by others.' [Citations.]" (*Valdez* v. *Federal Mut. Ins. Co.* (1969) 272 Cal.App.2d 223, 226-227 [77 Cal.Rptr. 411].) Courts have always strictly construed any effort to exclude or modify this required coverage. (*Dufresne* v. *Elite Insurance Co.* (1972) 26 Cal.App.3d 916, 922 [103 Cal.Rptr. 347, 55 A.L.R.3d 206].) Since first enacted, the statute required that any agreement attempting to delete this required coverage had to be in writing and, by amendment effective March 7,

1973, the form of that agreement is now specified (Ins. Code, § 11580.2, subd. (a)(2)).

Delay suffered by Mrs. Delos in reference to her claim for UM coverage and the program by the Exchange to market GB were not isolated and distinct events. A principle cause for the confusion and delay in the handling of her claim was the Exchange's belief that UM coverage was automatically waived when GB was added to a policy. Thus information relating to the Delos policy, when fed into the computer, equated the Deloses' wish to add coverage with their loss of UM coverage, contrary to the actual decision of Mrs. Delos, who at no time intended to waive her UM coverage.

We have indicated our approval of the trial court's description of defendants' GB program as a nefarious scheme. We will not dwell on the innumerable reasons which support our conclusion. GB coverage was inaccurately described as new coverage, but in fact, the medical provisions of automobile policies were longstanding and disability income had been available for several years. The certainty of the coverage was also unclear. The assistant general counsel for defendants' corporate legal department testified that even he did not know whether wage loss under GB coverage was in excess of sick leave. Defendants also knew a large percentage of their policyholders had no need for high medical payment coverage; thus permitting the reasonable inference that coverage of $15,000/$30,000 limits was solely to confuse purchasers with the identical requirements of the financial responsibility laws of the Vehicle Code. The notice sent to policyholders that cost of the new coverage was less than a policyholder's present cost was also in error. The cost for a policyholder would necessarily vary depending on existing coverage; for example, in Mrs. Delos' case, her former $2,000 medical payment with UM coverage was less than GB coverage.

Defendants' cavalier attitude toward their policyholders was also reflected in their response to information that their first notice (stuffer No. 1) describing GB included an invalid waiver. Although as a matter of law they were required to honor all UM claims, they recognized only claims for those persons with lawyers and ignored other claimants who did not have counsel. When the question was raised as to the validity of stuffer No. 2, the Exchange followed advice from corporate counsel to take their chances, although recognizing the substantial likelihood that the waiver of UM coverage was invalid.

Mrs. Delos was treated with the same disdain as were other policyholders who were subjected to the marketing program involving GB. Her claim for UM coverage was processed at a time when difficulties with the GB program became obvious to management. Instead of receiving an increase in profits, the underlying purpose behind the GB concept, the Exchange was faced with a possible loss, for UM coverage was now present in all insurance policies in which the waivers were ineffective without offsetting premium income for that coverage. It is impossible to isolate the decisions of the Group in reference to the handling of the Delos claim from the philosophies relating to the design and implementation of the GB program. The verdict rendered by the jury indicated its understanding of the realities of the corporate decisional process.

We are governed in this appeal, however, not by the presumption of correctness of the verdict, but of the trial court order. Although we have expressed our disagreement with a major reason given for the new trial order, we must examine the other reasons and, if there is a substantial basis in the evidence for any reason, we must affirm the order.

To a limited extent, the court relied on the relationship between compensatory and punitive damages, which it described as astronomical. We doubt whether a mathematical analysis merely describing the ratio between punitive and compensatory damages is in itself an adequate basis to reduce the award, but the court went further and described the insignificant effect of defendants' conduct on plaintiffs. "They [plaintiffs] were upset, angry, disturbed, considered they were being pushed around, but with the fight being carried on by their counsel and no hardship shown." (See fn. 9, p. 25, *supra.*) The trial court has the prerogative to independently determine the reprehensibility of defendants' conduct in a particular case and may consider the amount of compensatory damages in assessing the degree of reprehensibility. (*Neal* v. *Farmers Ins. Exchange, supra,* 21 Cal.3d 910, 933.) Thus a consideration of the relationship between the amount of compensatory and punitive damages in the instant case to determine whether the amount of punitive damages was excessive was proper.

The trial court's statement that plaintiffs' suit was not a class action assumes the number of plaintiffs involved in an action is a legitimate consideration in evaluating a punitive damage award. Evidence was presented which made the court aware of the pendency of other actions involving the same defendants and identical issues. In determining whether an award is sufficient, the court must consider whether the award

reaches a level necessary to adequately punish and deter the wrongdoer. The court must consider the reprehensibility of the conduct for the more reprehensible the act, the greater the appropriate punishment. (*Bertero* v. *National General Corp.* (1974) 13 Cal.3d 43, 65 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878]; *Fletcher* v. *Western National Life Ins. Co.* (1970) 10 Cal.App.3d 376, 408-409 [89 Cal.Rptr. 78, 47 A.L.R.3d 286].) It is logical to conclude that one measure of a party's culpability is the number of persons affected by the errant conduct. Consequently, punitive damages imposed for a class action will necessarily be larger than the award rendered in a similar action for a single plaintiff involving identical conduct. On this assumption, in the absence of other judicial or legislative restraints, judicial control in the form of a remittitur, provided the reduced amount is adequate to deter the criticized conduct, is proper where there is the likelihood of several jury-imposed punitive damage awards, each of which is sufficient to punish in the entirety for the misconduct involved.

We conclude therefore, the new trial order was proper for there was a substantial basis for the court's decision that punitive damages of $4 million was excessive. The inordinate reduction of that award to $350,000 requires further comment, for a punitive damage award which fails to adequately punish is as legally defective as an award which overpunishes.

A major reason underlying the power of the court to impose conditions on its order granting a new trial is judicial economy. If the affected party consents to either the reduced or increased amount of damages, expense, delay and uncertainty associated with needless retrials are avoided. Whether the exercise of this discretionary power is meaningful turns, however, on the choice available to counsel. Obviously, where a remittitur is too low, the party affected will have no alternative but to reject the reduced sum as not commensurate with the damages suffered.

It is apparent from the court's order granting the new trial that had it felt it legally proper to consider the conduct relating to the GB program, it would have selected a sum substantially greater than $350,000—a sum which would have been consistent with the views we have expressed. It thus appears appropriate to remand the case for further proceedings consistent with our opinion. We are unable to do so. Our concern with judicial economy does not mesh with the limited power of the trial court to act upon the motion for a new trial after the expiration of the statutory time limits (Code Civ. Proc., § 660; *Mercer* v. *Perez* (1968) 68 Cal.2d 104, 118-124 [65 Cal.Rptr. 315, 436 P.2d 315]; *Lippold* v. *Hart* (1969) 274

Cal.App.2d 24, 27 [78 Cal.Rptr. 833]) and this case does not fall within any judicially created exception to that limited power. (*Jehl* v. *Southern Pac. Co.* (1967) 66 Cal.2d 821, 835 [59 Cal.Rptr. 276, 427 P.2d 988]; *Clemens* v. *Regents of University of California* (1970) 8 Cal.App.3d 1, 20-22 [87 Cal.Rptr. 108].) We also decline to exercise our power under Code of Civil Procedure section 43 to increase the remittitur. (See Cal. Rules of Court, rule 24(b).) We are thus prevented from doing what seems to be so simple—remanding the case to permit the court to reevaluate what in its independent judgment is the proper amount of punitive damages after consideration of all relevant data. We question whether our inability to do so aids the efficient administration of justice.

*Disposition*

Judgment in favor of plaintiffs against Farmers Insurance Exchange for $2,500 and against Farmers Insurance Group for $8,000 is affirmed. The order granting the new trial is affirmed subject to plaintiffs filing their written consent to the reduced sum of $350,000 within 30 days of the return of the remittitur to the trial court, in which event judgment in favor of plaintiffs against Farmers Insurance Group in the sum of $350,000 shall be entered.[10] Defendants to bear all costs on appeal.

Brown (Gerald), P. J., and Harelson, J.,* concurred.

Petitions for a rehearing were denied June 18, 1979, and the petitions of all the parties for a hearing by the Supreme Court were denied August 29, 1979.

---

[10]We have renewed plaintiffs' option to accept the reduced sum to avoid retrial because they were deprived of the full 30 days to accept the $350,000 by defendants' notice of appeal filed within that period.

*Assigned by the Chairperson of the Judicial Council.