Scott WOLF, Brenda Wolf, husband and wife, Plaintiffs–Appellants,

v.

PRUDENTIAL INSURANCE COMPANY OF AMERICA, a New Jersey corporation; the Prudential Service Bureau, Inc., a foreign corporation; the Prudential Life Insurance Company, a foreign corporation, Defendants–Appellees,

and

Annuity Board of the Southern Baptist Convention, Inc., a Texas Corporation, Defendant.

No. 94–5140.

United States Court of Appeals, Tenth Circuit.

March 6, 1995.

John H. Tucker, Mary Quinn–Cooper, and Catherine C. Taylor of Rhodes, Hieronymus, Jones, Tucker & Gable, Tulsa, OK, for plaintiffs-appellants.

Elsie Draper and Timothy A. Carney of Gable and Gotwals, Tulsa, OK, for defendants-appellees.

Before MOORE, BARRETT, and EBEL, Circuit Judges.

EBEL, Circuit Judge.

Plaintiffs Scott and Brenda Wolf brought this action against defendant Annuity Board of the Southern Baptist Convention, Inc. and

defendant-appellee Prudential[1] asserting claims related to defendants' denial of coverage for breast cancer treatment under a medical benefits plan sponsored by the Annuity Board and administered by Prudential. The Wolfs initially brought claims for breach of contract and specific performance against both the Annuity Board and Prudential and a claim for breach of the duty of good faith against Prudential. On motions for summary judgment by defendants, the district court granted Prudential's motion but denied the Annuity Board's. Plaintiffs moved for reconsideration of summary judgment in favor of Prudential and also moved to amend their complaint to assert a claim for breach of duty of good faith against the Annuity Board and claims for negligence and deceit against both the Annuity Board and Prudential. The court denied both motions. Plaintiffs eventually settled with the Annuity Board, and it is not part of this appeal. Plaintiffs appeal the grant of summary judgment in favor of Prudential and denial of their motions for reconsideration and to amend. We have jurisdiction under 28 U.S.C. § 1291.[2]

Scott Wolf is an associate pastor of the First Baptist Church of Morris, Oklahoma, and he and Brenda are insured under a medical benefits plan sponsored by the Annuity Board. The plan is a church-sponsored plan not governed by ERISA. 29 U.S.C. §§ 1002(33), 1003(b)(2). Ms. Wolf was diagnosed with breast cancer in November 1987. She was initially treated with "standard" chemotherapy that was covered under the medical benefits plan. In October 1990, her breast cancer was found to have metastasized with the discovery of a nodule of cancer in her lung. She was given three options of treatment and chose high dose chemotherapy

with autologous bone marrow transplant (HDC/ABMT). In this procedure, the patient donates her own bone marrow, which is stored while she undergoes high dose chemotherapy. After the chemotherapy drugs have cleared her system, the marrow is reinfused into the patient. On November 20, 1990, Ms. Wolf entered the hospital to have her bone marrow harvested. On February 25, 1991, she entered the hospital to undergo high dose chemotherapy and reinfusion of her bone marrow. She was hospitalized for about a month.

Through a memorandum of understanding between Prudential and the Annuity Board, Prudential took over administration of the Annuity Board's medical benefits plan in July 1990. Under the memorandum of understanding, Prudential was to administer the existing plan, which the parties and district court refer to as the Aetna plan, until Prudential and the Annuity Board agreed on a new plan. At some time no earlier than January 1, 1991, Prudential and the Annuity Board implemented a new plan that the parties refer to as the Church plan.[3] Both the Aetna and Church plans excluded coverage for treatment considered experimental or investigational, though the exclusionary language in the two plans differed. The Aetna plan excluded coverage for treatment "considered experimental in nature and practices not generally approved by the AMA." Appellants' App., Vol. II at 472. The plan did not define the term "experimental." The Church plan excluded coverage for "experimental or investigational" treatments, and defined "experimental or investigational" to mean

that the medical use of a service or supply is still under study and the service or

---

1. We will refer to defendants-appellees Prudential Insurance Company of America, The Prudential Service Bureau, Inc., and The Prudential Life Insurance Company, as "Prudential."

2. After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed.R.App.P. 34(a); 10th Cir.R. 34.1.9. The case is therefore ordered submitted without oral argument.

3. Prudential and the Annuity Board also entered into an administrative service agreement detail-

ing the parties' obligations with respect to administration of the Church plan. The Church plan apparently is a Prudential form policy. Aetna Life Insurance Company preceded Prudential as plan administrator, and the Aetna plan is apparently an Aetna form policy.

For simplicity, we will refer to the memorandum of understanding and administrative services agreements between Prudential and the Annuity Board as agreements. We will refer to the medical insurance policies as plans.

supply is not recognized throughout the Doctor's profession in the United States as safe and effective for diagnosis or treatment.

This includes, but is not limited to: All phases of clinical trials; all treatment protocols based upon or similar to those used in clinical trials; ....

*Id.*, Vol. I at 73.

Plaintiffs sought coverage for Ms. Wolf's HDC/ABMT treatment both in November 1990 when she had her bone marrow harvested and in February 1991 (and later) when she received the high dose chemotherapy and reinfusion. The HDC/ABMT treatment Ms. Wolf received was part of a Phase II clinical trial conducted by her oncologist. Both in November 1990 and in February 1991 and thereafter, Prudential denied coverage on the basis that the treatment was experimental or investigational and therefore excluded from coverage. Plaintiffs then brought this action.

Prudential moved for summary judgment in part on the basis that it was merely a claims service provider or administrator of a self-funded medical benefits plan, and therefore had no liability to the Wolfs for benefits under any contract nor owed them an insurer's duty of good faith. The Wolfs argued that they were third-party beneficiaries of the agreements between Prudential and the Annuity Board, that the agreements provided benefits to them in part because Prudential accepted a portion of the risk under a stop-loss provision, and Prudential was obligated to make payment under the contract and to act in good faith.

The district court agreed with Prudential. It concluded that the Wolfs were not third-party beneficiaries of the agreements between Prudential and the Annuity Board because the stop-loss provision provided for payments only from Prudential to the Annuity Board and not to plan participants such as the Wolfs. The court also concluded that Prudential's provision of claims services did not provide a basis for a bad faith claim or a contract claim against Prudential. The court reiterated these conclusions in denying plaintiffs' motion to reconsider. The court denied the motion to amend against Prudential because the motion was untimely (well after

discovery ended) and plaintiffs failed to provide any good cause for the untimeliness.

We review the grant or denial of summary judgment de novo, applying the same legal standard used by the district court pursuant to Fed.R.Civ.P. 56(c). *Universal Money Ctrs., Inc. v. AT & T,* 22 F.3d 1527, 1529 (10th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 655, 130 L.Ed.2d 558 (1994); *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.,* 912 F.2d 1238, 1241 (10th Cir.1990). "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Universal,* 22 F.3d at 1529 (quoting Fed.R.Civ.P. 56(c)). "When applying this standard, we examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." *Applied Genetics,* 912 F.2d at 1241. If there is no genuine issue of material fact in dispute, then we next determine if the substantive law was correctly applied by the district court. *Id.*

While the movant bears the burden of showing the absence of a genuine issue of material fact, the movant need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Universal,* 22 F.3d at 1529. If the movant carries this initial burden, the non-movant may not rest upon its pleadings, but must set forth specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986); *Applied Genetics,* 912 F.2d at 1241. An issue of material fact is genuine if a reasonable jury could return a verdict for the non-movant. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

*Breach of contract claim*

On appeal, plaintiffs first contend that the district court erred in dismissing their claim

for breach of contract on the basis that they are third-party beneficiaries of the agreements between Prudential and the Annuity Board. They contend that "the Wolfs were to receive benefits in the form of claims servicing, brochures and other information, the stabilization of the self-funded Plan through loss sharing and stop loss guarantees, as well as reinsurance if the claims amounted to more than could be covered." Appellants' Br. at 12.

■ Third-party beneficiaries have a right to enforce contracts made expressly for their benefit. *See Roach v. Atlas Life Ins. Co.*, 769 P.2d 158, 161 (Okla.1989); Okla.Stat. tit. 15, § 29. We agree that plaintiffs are third-party beneficiaries of the agreements to the extent that they are entitled to receive claims service from Prudential. The relief plaintiffs seek from Prudential, however, is not claims service but payment under the plans for what they contend is covered treatment. In this regard, we agree with the district court that plaintiffs are not third-party beneficiaries of the agreements. Under the Aetna and Church plans and the agreements between the Annuity Board and Prudential, only the Annuity Board is obligated to pay plan participants such as the Wolfs for covered claims.[4] The agreements provide a direct benefit to the Annuity Board by essentially reinsuring the Board for covered claims above a certain amount. Plaintiffs point to nothing in any agreement or plan that relieves the Annuity Board of its obligation to pay covered claims regardless of the total amount of its claims or losses it incurs. Thus, the only direct beneficiary of the stop-loss provision is the Annuity Board, and any benefit plan participants receive through "stabilization" of the plans or reinsurance is incidental. The Wolfs' contract claim fails.

*Bad faith claim*

■ The Wolfs next contend that the district court erred in concluding that they could not maintain an action against Prudential in its role as plan administrator for breach of an insurer's duty of good faith. The district court relied on *Timmons v. Royal Globe Insurance Co.*, 653 P.2d 907, 912 (Okla.1982), and *Gruenberg v. Aetna Insurance Co.*, 9 Cal.3d 566, 108 Cal.Rptr. 480, 510 P.2d 1032 (1973), to conclude that Prudential's claims handling services do not provide a basis for a bad faith action because Prudential is merely the insurer's agent and is a "stranger to the [insurance] contract." *Timmons*, 653 P.2d at 913.

We do not believe that *Timmons* or *Gruenberg* are necessarily dispositive of the issue because the insurers' agents in those cases were not nearly as involved in the insurance process as Prudential was here.[5] We believe the analysis should focus more on the factual question of whether the administrator acts like an insurer such that there is a "special relationship" between the administrator and insured that could give rise to a duty of good faith. *See generally Christian v. American Home Assurance Co.*, 577 P.2d 899, 902–04 (Okla.1978). *Christian* found that the special relationship on which an insurer's duty of good faith is based results from the quasi-public nature of insurance, the unequal bargaining power between the insurer and insured, and the potential for an insurer to unscrupulously exert that power at a time when the insured is particularly vulnerable. *Id.* at 902.

Assessing the facts in plaintiffs' favor, Prudential looks much like an insurer. One of its primary obligations was to assume the ordinary insurer role of investigating and servicing claims. Though its agreements with the Annuity Board appear to give the

---

**4.** Checks to pay covered claims were apparently drawn on a Prudential account, but the account either contained Annuity Board funds or was immediately reimbursed by the Annuity Board.

**5.** The agents in *Gruenberg* were the claims adjusters and attorneys investigating the insured's claim. 108 Cal.Rptr. at 486, 510 P.2d at 1038. *Timmons* does not identify what role the agent played, but there is no indication he was as

involved in the process as Prudential is here. *Timmons* relied on another California case in addition to *Gruenberg, Egan v. Mutual of Omaha Insurance Co.*, 24 Cal.3d 809, 169 Cal.Rptr. 691, 699, 620 P.2d 141, 149 (1979), *appeal dismissed, cert. denied*, 445 U.S. 912, 100 S.Ct. 1271, 63 L.Ed.2d 597 (1980), but again the insurer's agents in *Egan* were merely claims adjusters, *id.*, 169 Cal.Rptr. at 693–94, 620 P.2d at 143–44.

Board ultimate responsibility for benefit determination, those determinations through at least two levels of appeal in this case were made by Prudential. Moreover, the Church plan tells plan participants that only Prudential is involved in benefit determinations:

> The Coverages in this Schedule of Benefits are provided by the Annuity Board.... They have arranged to have claims paid by The Prudential Insurance Company of America. Prudential (as Claims Services Provider) determines the benefits for which you and your family members qualify under the Plan.

Appellants' App., Vol. I at 48.[6] As payment for administering the plans, Prudential received a percentage of the premiums paid to the Annuity Board for participant coverage. As losses decreased, Prudential's share of the premiums increased. Additionally, under the stop-loss provision of its agreements with the Board, when losses reached a certain level, Prudential shared the risk with the Board; when losses got even higher, Prudential underwrote the entire risk. This profit and loss sharing arrangement was described as a "risk sharing and cost arrangement ... which will provide for an increased liability to Prudential if the loss development is adverse. The Prudential will receive an increased Retention if the loss development is favorable." *Id.*, Vol. II at 347. In sum, Prudential had primary control over benefit determinations, and assumed some of the risk of these determinations. It thus undertook many of the obligations and risks of an insurer.

We therefore do not see Prudential as a "stranger" to the insurance contracts in this case. It was contractually obligated to administer the plans, and its contractual obligation directly benefitted plaintiffs as third-party beneficiaries of its agreements with the Annuity Board. The contractual obligation combines with the fact that Prudential's benefit determinations could at least indirectly affect its profits and losses to create a special relationship between Prudential and plaintiffs. In other words, on the facts as presented by plaintiffs, Prudential had the power, motive and opportunity to act unscrupulously. We believe that the Oklahoma Supreme Court would impose a duty of good faith on an entity in Prudential's position, for the same reasons it imposed the duty on "true" insurers. *See Christian,* 577 P.2d at 902–04.[7] We thus hold that as a matter of law, a plan administrator in Prudential's situation could be subject to the duty of good faith. Whether Prudential should be subject to that duty is a factual question that we leave to the district court.

As an alternative basis for affirming summary judgment, Prudential argues, as it did in the district court, that even if it is subject to a duty of good faith, it is entitled to summary judgment because it had a legitimate basis for denying coverage and thus acted in good faith. We agree with respect to its denial of coverage under the Church plan. We disagree, however, with respect to the Aetna plan.

The essence of an insurer's breach of its duty of good faith is "unreasonable, bad-faith conduct, including the unjustified withholding of payment due under a policy." *McCorkle v. Great Atlantic Ins. Co.,* 637 P.2d 583, 587 (Okla.1981). "The tort of bad faith does not foreclose the insurer's right to deny a claim; an insurer clearly has the right to resist payment and litigate any claim to which it has a reasonable defense." *Willis v. Midland Risk Ins. Co.,* 42 F.3d 607, 611 (10th Cir.1994) (citing *Buzzard v. Farmers Ins. Co.,* 824 P.2d 1105, 1109 (Okla.1991), and *Manis v. Hartford Fire Ins. Co.,* 681 P.2d 760, 761 (Okla.1984)). The focal point of the analysis is the point at which the insurer denies the claim. "The decisive question is whether the insurer had a good faith belief, at the time its performance was requested, that there was a justifiable reason for with-

---

**6.** The Aetna plan similarly indicated that the administrator was responsible for benefit determinations. *See, e.g.,* Appellants' App., Vol. II at 472, 481.

**7.** In analogous situations, a number of courts have found entities such as Prudential potentially liable in bad faith actions. *See Scott Wetzel Servs., Inc. v. Johnson,* 821 P.2d 804, 811–13 (Colo.1991); *Sparks v. Republic Nat'l Life Ins. Co.,* 132 Ariz. 529, 647 P.2d 1127, 1137–38, *cert. denied,* 459 U.S. 1070, 103 S.Ct. 490, 74 L.Ed.2d 632 (1982); *Delos v. Farmers Ins. Group, Inc.,* 93 Cal.App.3d 642, 155 Cal.Rptr. 843, 849 (1979).

holding payment under the policy." *Id.* at 612; *see also Oulds v. Principal Mut. Life Ins. Co.,* 6 F.3d 1431, 1437 (10th Cir.1993) (determining merits of bad faith claim under Oklahoma law requires evaluation of what insurer knew or should have known at the time insured sought coverage for claim). In evaluating an insurer's entitlement to summary judgment on a bad faith claim, we must first determine whether the insurer's conduct may reasonably be perceived as tortious. *Willis,* 42 F.3d at 612. Unless the facts, construed against the insurer, show tortious conduct on the part of the insurer, it is entitled to summary judgment. *Oulds,* 6 F.3d at 1437.

■ To the extent that the Church plan governs coverage for Ms. Wolf's treatment, we conclude that Prudential had a reasonable basis for denying coverage and cannot reasonably be seen as acting in bad faith. Prudential denied coverage on the basis of the Church plan's exclusion for experimental or investigational treatment. Appellants' App., Vol. I at 267–72. It is undisputed that Ms. Wolf's treatment was part of a clinical trial, and the experimental or investigational exclusion specifically excluded "[a]ll phases of clinical trials [and] all treatment protocols based upon or similar to those used in clinical trials." *Id.* at 73. Prudential had a justifiable basis for denying coverage under the Church plan, and is entitled to summary judgment on the bad faith claim with respect to the Church plan.

■ The Church plan became effective at the earliest on January 1, 1991, and it provided that "[a]ny benefits under the coverages for expenses of a person's medical care for charges incurred prior to January 1, 1991, will be determined in accordance with the plan in effect on the date the service was rendered." *Id.* at 48.[8] The Aetna plan was

in effect in November 1990 when Ms. Wolf first began her HDC/ABMT treatment and first sought coverage for that treatment and when Prudential first denied coverage. That plan did not contain the explicit exclusion for clinical trials that the Church plan contained, but contained only the general exclusion for treatment considered "experimental."

Prudential argues that even under the Aetna plan, there is a legitimate dispute over whether the treatment would be excluded as experimental and that its denial of coverage under the Aetna plan cannot be seen as tortious. In support of this argument, Prudential cites *Lehman v. Mutual of Omaha Insurance Co.,* 806 F.Supp. 859, 861 (D.Ariz. 1992), which found that the fact that "courts differ on whether HDCT–ABMT is 'experimental' is evidence that the issue is 'fairly debatable'." Prudential also points to the district court's determination, again with respect to the Annuity Board's summary judgment motion, that experimental was ambiguous and that it was a disputed issue of fact whether HDC/ABMT would be considered "experimental." *See* Appellants' App., Vol. II at 504.[9]

We do not accept Prudential's argument. The fact that courts differ on the meaning of experimental may well mean that the term is ambiguous, but it does not necessarily mean that the coverage question in a given case is "fairly debatable." And assuming "experimental" is ambiguous, Prudential's argument fails on consideration of the rules governing insurance policy interpretation.

"An insurance policy, like any other contract of adhesion, is liberally construed, consistent with the object sought to be accomplished...." *Dodson v. St. Paul Ins. Co.,* 812 P.2d 372, 376 (Okla.1991). "When an insurance contract is susceptible of two

---

8. We note that in its order denying the Annuity Board's motion for summary judgment, the district court determined that the effective date of the Church plan was a disputed issue of fact. Though the plan stated it was effective on January 1, 1991, plaintiffs presented evidence that it was not implemented until some time after Ms. Wolf completed her treatment. Appellants' App., Vol. II at 504–05. That determination is not before us, and we express no opinion on when the Church plan became effective.

9. We note also that the district court denied plaintiffs' motion to amend their complaint to state a bad faith claim against the Annuity Board in part because there was a "legitimate dispute" over whether the treatment would be covered under the Aetna plan. Appellants' App., Vol. II at 593.

meanings, i.e. if it is subject to an ambiguity, the familiar rule of insurance contract interpretation applies and words of inclusion are liberally construed in favor of the insured and words of exclusion strictly construed against the insurer." *Phillips v. Estate of Greenfield,* 859 P.2d 1101, 1104 (Okla.1993).[10] Insurers are obviously well aware of this "familiar rule," but Prudential's argument would allow them to ignore it with impunity. Under Prudential's argument, an insurer could intentionally insert an ambiguous term into a policy and continually deny coverage based on that term, despite contrary court decisions or its own doubts about the meaning of the term. The insurer could lose coverage cases (though many insureds would not litigate and would accept the insurer's denial of coverage), but would never face a bad faith claim because its ambiguous term would create a "legitimate dispute."[11] Such actions by an insurer would not be in good faith and could not be countenanced. Thus, mere ambiguity cannot, as a matter of law, create a valid defense to a bad faith claim.

■ We are inclined to agree with the district court that the exclusion for "experi-

mental" treatment is ambiguous with respect to whether it excludes HDC/ABMT. *See, e.g., Dahl–Eimers v. Mutual of Omaha Life Ins. Co.,* 986 F.2d 1379, 1383 (11th Cir.1993) (finding undefined "experimental" exclusion ambiguous where there is no indication who will determine whether treatment is experimental nor any standards for making that determination). However, we need not decide whether the term "experimental" is itself ambiguous. Plaintiff presented evidence from two oncologists specializing in this treatment, including her own treating oncologist, that HDC/ABMT for a woman in Ms. Wolf's situation was not experimental in 1990 to 1991 under any reasonable definition of that term. Appellants' App., Vol. III at 629, 653, 654, 681. Thus, there is a reasonable dispute over both whether the Aetna plan excluded coverage for Ms. Wolf's treatment and whether Prudential's denial of coverage was justified. "[I]f there is conflicting evidence from which different inferences might be drawn regarding the reasonableness of insurer's conduct, then what is reasonable is always a question to be determined by the trier of fact by a consideration of the circum-

---

**10.** We realize that the policy here was apparently drafted by Aetna rather than Prudential and that the policy was issued by the self-insured Annuity Board. We are not bothered by these facts in applying the general rules of insurance policy construction. The policy at issue is a printed form, and there is no indication, nor is it likely, that the Wolfs had any input into the drafting of that form. We see no reason to stray from application of the general rule of construction in favor of the insured merely because of innovative insurance administration and funding practices.

**11.** We are not necessarily implying that Prudential has taken this position in this litigation. We do note that coverage under undefined experimental exclusions, particularly for HDC/ABMT treatments, has been a frequently litigated issue. " 'Since ... February 1989, we have found 24 published federal cases construing this exclusion [for experimental services]. This amount of litigation reveals the uncertainty caused by undefined experimental procedure exclusions for insurance consumers and litigants alike.' " *Pitman v. Blue Cross & Blue Shield of Okla.,* 24 F.3d 118, 124 n. 11 (10th Cir.1994) (quoting *Heasley v. Belden & Blake Corp.,* 2 F.3d 1249, 1263 n. 15 (3d Cir.1993)). We also note that Prudential has been involved in disputes over coverage for HDC/ABMT under policies containing undefined experimental exclusions since at least 1989. *See Dozsa v. Crum & Forster Ins. Co.,* 716 F.Supp.

131, 132, 134 (D.N.J.1989). Adverse court decisions involving coverage for HDC/ABMT have forced at least one insurer to change its coverage position: "[T]he district court implicitly embraced Blue Cross's concession it could no longer consider HDC/ABMT [to treat advanced breast cancer] experimental given the growing number of adverse decisions noted in *Wilson v. Group Hospitalization & Medical Servs., Inc.,* 791 F.Supp. 309, 311 (D.D.C.1992)." *Pitman,* 24 F.3d at 124 n. 11. In fact, plaintiffs here presented evidence from which it could be inferred that Prudential at some point took the position that it could not deny claims where the policy excluded only "experimental" treatment but could if the policy excluded "experimental and investigational" treatment. Appellants' App., Vol. III at 691.

Moreover, as the Fifth Circuit has noted, "[o]f course, it is the nature of medical research that what may one day be experimental may the next be state of the art treatment." *Holder v. Prudential Ins. Co.,* 951 F.2d 89, 91 (5th Cir.1992). "Several recent studies and the cases in which they have been applied to compel coverage of HDC–ABMT for Stage IV metastatic breast cancer lead to the conclusion that the treatment, under a different protocol than that administered to Mrs. Holder [apparently in 1987], may no longer be considered experimental." *Id.* n. 5 (citing cases).

stances in each case." *McCorkle*, 637 P.2d at 587. Summary judgment in Prudential's favor is therefore inappropriate.

*Motion to amend complaint*

Finally, plaintiffs contend that the district court erred in denying, after it had already granted summary judgment to Prudential, their motion to amend their complaint to add a negligence claim. Plaintiffs contend that their original complaint actually included a negligence claim, and that what they were really doing was asking the court to "reinstate" it. We do not believe that plaintiffs' original complaint can seriously be read to include a negligence claim. The district court did not abuse its discretion in denying the motion to amend.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED for proceedings not inconsistent with this opinion.

