APPEL, Justice (dissenting).
In this case, a federal court has asked us to decide whether a third-party administrator may be subject to liability for the tort of bad faith in the handling of a workers' compensation claim. The majority believes there is no basis in Iowa law for extending bad-faith liability to third-party administrators in the workers' compensation setting. I disagree.
I. The Nature of the Problem: Outsourcing the Insurance Function.
Although resisted fiercely for decades, it is now widely accepted that first and third parties may bring bad-faith claims against insurers. These bad-faith claims arise even though there is no privity of contract in third-party claims and even though there is no express statutory authorization of such claims. Bad-faith claims are particularly important in the administration of workers' compensation systems, where injured workers seek prompt and efficient adjustment of claims related to workplace injuries.
No one can seriously doubt that the potential of a bad-faith claim is a powerful deterrent that tends to prevent an insurance company from taking advantage of its position of power in the claims handling process. Bad-faith claims can affect an insurance company's bottom line, and no insurance company employee wants to be a decision-maker on a claim that exposes the employer to potentially substantial liability. Liability for bad-faith claims is an essential component of the effective control of insurance practices and protection of the insureds' interests.
In recent years, however, insurance companies are increasingly "outsourcing" insurance operations to third parties. Through such "outsourcing," the real functions of insurance may be performed by these third parties. But the third parties *625 are not subject to insurance regulation, and according to traditional rules related to lack of privity as well as narrow views of agency, other courts in the past have held that insurance intermediaries such as third-party administrators are not liable to the insured for bad-faith claims.
Some courts and scholars have regarded this situation as simply untenable. As noted by one insurance commentator,
with reduced incentive to discharge their duties well, the other intermediaries frequently act negligently, recklessly, or even in bad faith, needlessly creating claims imbroglios that could be avoided, minimized, or streamlined.
Jeffrey W. Stempel, The "Other" Intermediaries: The Increasingly Anachronistic Immunity of Managing General Agents and Independent Claims Adjusters , 15 Conn. Ins. L.J. 599, 603 (2009) [hereinafter Stempel]. I think anyone who has fussed with a third-party administrator in an insurance context will know exactly what the commentator is talking about.
Depending on the method used to compensate the third-party administrator, the need for accountability for bad-faith conduct may increase. For instance, a compensation scheme that provides greater compensation to a third-party administrator as the claims paid decrease provides a powerful incentive to act in a fashion against the interests of the insured.
In recent years, a body of caselaw has developed addressing the question of whether third-party administrators should be liable to an insured for poor claims handling. Although some cases adhere to the traditional view affording immunity to third-party administrators and other intermediaries, a growing body of caselaw has come to a contrary result.
As will be seen below, no Iowa case has yet directly addressed the question of whether a third-party administrator may be held accountable for bad-faith torts by an insured. We thus have a choice in our common law development: should Iowa continue to adhere to traditional notions of privity or agency notwithstanding the growth of insurance intermediaries that have assumed many of the functions of an insurer? Or, instead, should Iowa follow the path of the cases that hold, in light of changed circumstances, that traditional approaches should give way to a more modern conception of the tort of bad faith? For the reasons expressed below, I would choose the latter course.
II. Evolving Caselaw on Third-Party Administrators' Liability in the Insurance Context.
A. Introduction. As Stempel has noted, the traditional view of some courts has been that a bad-faith claim could not be brought against a third party if there was no privity of contract. See, e.g. , Gruenberg v. Aetna Ins. , 9 Cal.3d 566, 108 Cal.Rptr. 480, 510 P.2d 1032, 1038-39 (1973) (en banc); see also Stempel, 15 Conn. Ins. L.J. at 615 (discussing Gruenberg ). In order to satisfy the privity requirement in bad-faith tort cases involving workers' compensation insurance, the courts engaged in a legal fiction, namely, that the employee should be considered a party to the contract between the insured and the insurer.
Privity notions have also sometimes been asserted in an effort to defeat a bad-faith claim against an intermediary insurance service provider. The argument is that as an agent of the insurer, the agent is liable only to its principal for potential shortcomings in the claims process.
Increasingly, however, just as privity was eliminated as an obstacle to first- and third-party bad-faith actions against an insurer, the traditional view that an agent of the insurer performing insurance functions for the insurer cannot be held liable for bad faith has been challenged in a number of states. These case developments were *626 well summarized by Professor Jeffrey W. Stempel in his presentation to the Association of American Law Schools Insurance Law Section's meeting in 2008, which was devoted to the examination of the role of insurance intermediaries. Stempel, 15 Conn. Ins. L.J. at 604-13 ; see also Hazel Beh & Amanda M. Willis, Insurance Intermediaries , 15 Conn. Ins. L.J. 571, 583-84 (2009). According to Stempel, "the greater near-autonomous role now shouldered by ... [third-party administrators] and independent adjusters demands that they be treated under the law on a par with the insurers they represent." Stempel, 15 Conn. Ins. L.J. at 603.
B. Negligence Claims Against Third-Party Insurance Providers. The first challenge to the application of privity in the context of insurance adjusters arose in a series of cases where insureds claimed that the insurance adjusters were negligent in the handling of claims. As noted by Stempel, three cases illustrate the nature of the common law development. Stempel, 15 Conn. Ins. L.J. at 630-37.
In Continental Insurance v. Bayless and Roberts, Inc. , 608 P.2d 281, 286-87 (Alaska 1980), the Alaska Supreme Court considered a case where a subsidiary of the insurance company functioned as a claims department and was sued for its failing to adequately investigate a claim and keep its insured informed regarding case developments. The Bayless court held that because of the lack of a contract with the insured, no contractual claim could be brought. Id. at 287. The court held, however, that the adjuster "could be held liable for negligence arising out of a breach of the general tort duty of ordinary care." Id.
The New Hampshire Supreme Court came to a similar conclusion in Morvay v. Hanover Insurance , 127 N.H. 723, 506 A.2d 333, 334-35 (1986). See Stempel, at 15 Conn. Ins. L.J. at 632-35. In this property damage case, an independent investigator hired to examine the cause of the fire determined it had a suspicious origin, leading to denial of the claim. See 506 A.2d at 333-34. The district court dismissed the policyholder's claim against the third-party investigator on grounds of lack of privity. Id. at 334. The Morvay court reversed, noting among other things that "investigators are under a general duty to use due care in the performance of their work." Id. at 334. The scope of the duty in Morvay , however, could be limited by limitations set by the contract with the insurer. Id. at 335. If the contract called for a $200 investigation, for example, the investigator's obligation was to use reasonable care in performing the work within the limits set by the insurer and advise the insurer if the investigator believed the scope of the investigation was too limited to come with a reliable result. Id.
The Mississippi Supreme Court considered the question of whether a third-party adjuster could be liable for negligence in Bass v. California Life Insurance , 581 So.2d 1087, 1088 (Miss. 1991). See Stempel, 15 Conn. Ins. L.J. at 635. In Bass , the Mississippi Supreme Court rejected the contention that the adjuster could be liable for negligence to the policy holder. 581 So.2d at 1090. But the Mississippi Supreme Court held that the adjuster could be held liable for gross negligence, malice, or reckless disregard of the rights of the policyholder if the adjuster had sufficient independent authority to rule on claims without insurer approval. Id.
These cases generally stand for the proposition that tort liability is distinguishable from contract liability and that agency principles do not provide complete immunity where an independent insurance service provider has wide autonomy in the determination of claims decisions. Of course, in all these cases, the insured had no direct *627 contract with the insurer or with the insurer's agent.
C. Application of Bad-Faith Tort to Third-Party Insurance Administrators. I now turn to consider cases that deal with a narrower proposition than negligence, namely, whether third-party administrators may be subject to bad-faith claims.
The development of the law in Oklahoma begins with the case of Wolf v. Prudential Insurance Co. of America , 50 F.3d 793 (10th Cir. 1995). In Wolf , the United States Court of Appeals for the Tenth Circuit considered whether a third-party administrator could be liable for bad-faith administration of claims under Oklahoma law. Id. at 797. The Wolf court noted under the facts of the case that the plan administrator had primary control over administering the plan and received a percentage of the premiums paid for participant coverage. Id. at 797-98. The Wolf court concluded that although the plan administrator was a stranger to the contract between the insured and the insurer, that was not the end of the matter. Id. at 798. According to the Wolf court, the analysis "should focus more on the factual question of whether the administrator acts like an insurer such that there is a 'special relationship' between the administrator and insured that could give rise to a duty of good faith." Id. at 797.
It turns out that the Tenth Circuit's prediction of how the Oklahoma courts would decide the issue of potential liability of third-party administrators was accurate. In Wathor v. Mutual Assurance Administrators, Inc. , 87 P.3d 559, 561 (Okla. 2004), the Oklahoma Supreme Court considered a case where the employer offered employees access to health insurance through a self-funded insurance program, the Oklahoma County Health and Dental Plan. The Oklahoma County Health and Dental Plan contracted with Mutual Assurance Administrators (MAA) to administer the plan. Id. The plaintiff claimed that the MAA, as third-party administrator, breached its duty of good faith in the administration of benefits. Id.
The Wathor court noted that the special relationship between an insurance company and the insured gave rise to a special relationship that created a nondelegable duty of good faith and fair dealing on the part of the insurer. Id. at 561-62. Thus, Oklahoma County Health and Dental Plan was potentially on the hook for bad faith. Id. at 562.
The Wathor court emphasized, however, that "the imposition of a nondelegable duty on the insurer does not necessarily preclude an action by an insured against a plan administrator for breach of an insurer's duty of good faith." Id. The Wathor court favorably cited Wolf , 50 F.3d at 797, for the proposition that the focus should be on the factual question of whether the plan administrator acted sufficiently like an insurer to give rise to a duty of good faith. 87 P.3d at 562. The Wathor court declared,
In a situation where a plan administrator performs many of the tasks of an insurance company, has a compensation package that is contingent on the approval or denial of claims, and bears some of the financial risk of loss for the claims, the administrator has a duty of good faith and fair dealing to the insured.
Id. at 563. Notably, the holding in Wathor did not turn on substantive support from the Oklahoma's workers' compensation scheme. See id. ; Stempel, 15 Conn. Ins. L.J. at 641 (discussing Wathor ).
The Colorado Supreme Court considered whether a third-party administrator could be liable to a bad-faith claim from an insured in a health insurance context in Cary v. United of Omaha Life Insurance , 68 P.3d 462, 463 (Colo. 2003) (en banc). In Cary, the court considered a claim against *628 a third-party administrator working for a health insurance company. Id. The Cary court noted that it had decided several cases holding a third-party administrator potentially liable for bad-faith claims under workers' compensation laws. Id. at 466-67. But the Cary court noted that the court had also extended potential bad-faith exposure of third-party liability claims in settings other than workers' compensation. Id. at 467-68. For example, in Transamerica Premier Insurance v. Brighton School District 27J , 940 P.2d 348, 349 (Colo. 1997) (en banc), the Colorado Supreme Court concluded that a third-party administrator could be liable for bad faith in the context of suretyship. So, the Cary court reasoned, the notion of bad-faith liability was not limited to the workers' compensation setting. See 68 P.3d at 468.
The Cary court recognized that an insurer had nondelegable duties. Id. at 466. But, the Cary court declared,
[T]he existence of this non-delegable duty does not mean that a third-party claims administrator never has an independent duty to investigate and process the insured's claim in good faith. When the actions of a defendant are similar enough to those typically performed by an insurance company in claim administration and disposition, we have found the existence of a special relationship sufficient for imposition of a duty of good faith and tort liability for its breach-even when there is no contractual privity between the defendant and the plaintiff.
Id.
The Cary court recognized that a prior case, Scott Wetzel Services, Inc. v. Johnson , 821 P.2d 804, 805 (Colo. 1991) (en banc), was based in part on Colorado's workers' compensation statute and that those considerations were not present in the health insurance context of Cary . See 68 P.3d at 467. Yet, the Cary court concluded that the special relationship between an insured and a third-party administrator was sufficient to support a claim of bad faith. Id. at 468 ; see Stempel, 15 Conn. Ins. L.J. at 644-47 (discussing Cary ).
A New Mexico appellate court considered the question of bad-faith liability for a third-party administrator in Dellaira v. Farmers Insurance Exchange , 136 N.M. 552, 102 P.3d 111, 112 (N.M. Ct. App. 2004). In Dellaira , an insurance company issued an automobile policy to an insured. Id. Another company "directed, handled, administered, and adjusted all claims." Id. When the claimant was dissatisfied with a property damage claim, she sought to join the management company as a defendant, employing a breach of good-faith theory. Id . at 113. The management company defended on the ground that there was no contract of insurance between the insured and the management company. Id.
According to the Dellaira court, "An entity that controls the claim determination process may have an incentive similar to that of an unscrupulous insurer to delay payment or coerce an insured into a diminished settlement." Id. at 115. Under these circumstances, the management company "acts as an insurer and is therefore bound within the special relationship created through the insurance contract." Id. The Dellaira court saw no reason why to limit bad-faith liability where "an entity related to or pursuant to agreement with the insurer issuing the policy has control over and makes the ultimate determination regarding the merits of an insured's claim." Id. The Dellaira court cited Cary , 68 P.3d at 478, for the proposition that an entity that controls the claim determination process may have an incentive similar to that of an unscrupulous insurer to delay payment or deny it altogether. Id. ; see Stempel, 15 Conn. Ins. L.J. at 637 n.79.
*629 At least one case in California supports the notion that a third-party administrator may be liable for bad-faith torts. In Delos v. Farmers Group, Inc. , 93 Cal.App.3d 642, 155 Cal. Rptr. 843, 846 (1979), an insured sought to recover from a management company for bad-faith denial of a claim. The management company did not have a direct contract with the insured. Id. at 848. But the Delos court concluded that a bad-faith claim would lie against the management company. Id. at 849. According to the Delos court, a contrary rule, among other things, would "deprive a plaintiff from redress against the party primarily responsible for damages." Id. ; see Stempel, 15 Conn. Ins. L.J. at 647 n.104.
Finally, the Arizona Supreme Court considered the question of bad-faith liability of third-party administrators in Sparks v. Republic National Life Insurance , 132 Ariz. 529, 647 P.2d 1127, 1137-38 (1982) (en banc). In this case, the Arizona Supreme Court considered the viability of a bad-faith claim against a company that was not in privity with the insured but provided insurance services. Id. The Sparks court concluded that lack of privity was not a bar to the claim and that the parties were jointly and severally liable for bad faith. Id. The Sparks court suggested it proceeded on a joint venture theory, but the traditional elements of a joint venture such as sharing profit and loss were not present in the case.[7] Id. at 1138. A later Arizona case relied on Sparks in finding a third-party administrator could be liable for a bad-faith claim even though there was no direct contract with the insured. Farr v. Transamerica Occidental Life Ins. Co. of Cal. , 145 Ariz. 1, 699 P.2d 376, 386 (Ariz. Ct. App. 1984) ; see Stempel, 15 Conn. Ins. L.J. at 647 n.103.
There have, of course, been cases to the contrary. For instance, in Natividad v. Alexsis, Inc. , 875 S.W.2d 695, 696 (Tex. 1994), a narrow majority of the Supreme Court of Texas declined to permit a claim that an adjusting firm and claims adjuster breached the duty of good faith and fair dealing in a workers' compensation context. The five-member Natividad majority stated that "the duty of good faith and fair dealing has only been applied to protect parties who have a special relationship based on trust or unequal bargaining power." Id. at 697 (emphasis added). The Natividad majority said that without a contract, there can be no special relationship and no duty of good faith and fair dealing. Id. at 698.
Four members of the Texas Supreme Court dissented. Id. at 700 (Gammage, J., concurring in part and dissenting in part). While the dissenters recognized there was no contract between the third-party administrator and the insured, there was a contract between the insurer and the third-party administrator to handle the claims of the insured's employees according to the terms of the insurance policy. Id. The Natividad minority noted that "[a] special relationship is one 'marked by shared trust or an imbalance in bargaining power.' " Id. at 701 (quoting Fed. Deposit Ins. Corp. v. Coleman , 795 S.W.2d 706, 708-09 (Tex. 1990) ). The time for measuring *630 the imbalance giving rise to a duty of good faith, according to the Natividad minority, was not at the time of contract formation but at the time of alleged denial or delay in payment. Id. at 700-01.
The Natividad minority noted prior caselaw where the Texas Supreme Court had noted that " '[a]n insurance company has exclusive control over the evaluation, processing and denial of claims' and can use that control in such a way that would subject the insured to 'economic calamity.' " Id. at 701 (alteration in original) (quoting Aranda v. Ins. Co. of N. Am. , 748 S.W.2d 210, 212 (Tex. 1988), overruled on other grounds by Tex. Mut. Ins. v. Ruttiger , 381 S.W.3d 430, 433 (Tex. 2012) ; Arnold v. Nat'l Cty. Mut. Fire Ins. , 725 S.W.2d 165, 167 (Tex. 1987) ). Here, the Natividad minority observed, the exclusive control that is so threatening is held not by the carrier, but by its agent. Id. The Natividad minority concluded that the reasoning for recognizing the duty to the covered employee's carrier extends as well to the carrier's agent. Id.
Another leading case cited by opponents of application of a bad-faith tort to insurance intermediaries is Sanchez v. Lindsey Morden Claims Services, Inc. , 72 Cal.App.4th 249, 84 Cal.Rptr.2d 799 (1999). In Sanchez , the failure of an independent adjuster to timely pay a valid $15,000 claim related to repair of an urgently needed dryer ordered by a customer of the insured led to a judgment against the insured for $1.325 million. Id. at 800. Remarkably, this case does not cite the usual privity and limitations of agency theories but instead fashions its approach based upon perceived public policy. Id. at 801-03 ; see Stempel, 15 Conn. Ins. L.J. at 657. The Sanchez court reasoned that if auditors in California have immunity, then third-party administrators should have immunity. Id. at 801-02. The Sanchez court warned that a third-party intermediary could face liability in excess of that faced by the principal. Id. at 802. See generally Stempel, 15 Conn. Ins. L.J. at 656-75 (discussing Sanchez and potential mischief of intermediary immunity).
III. Iowa Caselaw on Bad-Faith Torts.
There have been a number of Iowa cases dealing with the question of bad-faith torts in the insurance context. A review of these cases demonstrates that the issue before us is one of first impression and that our precedent does not prevent us from choosing to join the evolving caselaw extending potential liability, at least under some circumstances, to third-party administrators.
The first case of interest involving a first party bad-faith claim is Dolan v. Aid Insurance , 431 N.W.2d 790, 790 (Iowa 1988) (en banc). In this case, we recognized that an insured could bring an action in tort against an insurer for bad-faith conduct related to a claim made by its insured. Id. In a brief opinion, we distilled the arguments for and against the first party bad-faith tort as posing the question of
whether the contractual relationship between the insurer and insured is sufficiently special to warrant providing the insured with additional protection and, relatedly, by determining whether the insured's remedies for the insurer's wrongful conduct are adequate without resort to the tort of bad faith.
Id. at 792. We noted in prior cases we were not required "to closely scrutinize the contractual relationship between the insurer and insured, or to evaluate the adequacy of the insured's remedies were the insurer to engage in wrongful conduct." Id. at 793.
We then went on to state that we were "convinced traditional damages for breach of contract will not always adequately compensate an insured for an insurer's bad faith conduct." Id. at 794. We then concluded that a bad-faith tort in the first-party *631 setting was appropriate "to provide the insured an adequate remedy for an insurer's wrongful conduct." Id. We added that we "also" thought recognition of the tort was justified by the contractual relationship between the insurer and insured, noting that contracts of insurance are contracts of adhesion. Id.
The next case of interest is Boylan v. American Motorists Insurance , 489 N.W.2d 742, 742 (Iowa 1992). The question in this case was whether a first party tort of bad faith applied in the workers' compensation setting. Id. We noted that Iowa's workers' compensation statute imposes an affirmative obligation to furnish medical and hospital supplies to an injured employee and that administrative regulations place the obligation on the insurer. Id. at 743. We also concluded that the penalty provisions of the workers' compensation statute were not designed by the legislature to provide an exclusive remedy for wrongful conduct by carriers with respect to the administration of workers' compensation benefit. Id. at 744.
In finding that the tort of bad faith did apply, we cited a number of "well-reasoned decisions" from other courts. Id. at 743. Some of the well-reasoned decisions found first-party bad faith supported not by the language of the workers' compensation statute but by independent duties owed to the claimants. See id. For instance, in one of the well-reasoned decisions, Kaluza v. Home Insurance , 403 N.W.2d 230, 236 (Minn. 1987) (en banc), the Minnesota Supreme Court found that the claim was an "independent tort" that was "not within the scope of the workers' compensation system." In another well-reasoned case, the Montana Supreme Court emphasized that "courts have upheld the right to bring an action for independent intentional torts because the tortious conduct, which gives rise to the action, does not arise out of the original employment relationship." Hayes v. Aetna Fire Underwriters , 187 Mont. 148, 609 P.2d 257, 261 (Mont. 1980). In the well-reasoned case of Coleman v. American Universal Insurance , 86 Wis.2d 615, 273 N.W.2d 220, 223 (1979), superseded by statute as stated in Aslakson v. Gallagher Bassett Services, Inc. , 300 Wis.2d 92, 729 N.W.2d 712, 725 (2007), the Wisconsin Supreme Court approved a bad-faith claim, noting that when the "claimed injury was distinct in time and place from the original on-the-job physical injury which was subject to the Compensation Act. ... The Act does not cover the alleged injury." Thus, three of the well-reasoned cases endorsed by the Boylan court did not rely on statutory provisions in a workers' compensation statute to support a bad-faith claim. Given the Boylan court's warm citation to these cases, there is no reason to think that statutory support is necessary for a valid bad-faith claim in the workers' compensation setting.
The next case in the line of authority is Reedy v. White Consolidated Industries, Inc. , 503 N.W.2d 601, 602 (Iowa 1993). In this case, we held that the tort of bad faith applied where the employer was self-insured. Id. at 602-03. We noted that in order to be self-insured under the Iowa workers' compensation act, the employer has to assume the status of an insurer. Id. at 603. For the purpose of bad-faith tort claims, there was no difference between an employer acting as an insurer and an employer's insurance company. Id. Although unstated in Reedy , the reason for the equivalence is that when an entity assumes the functions of an insurer, it has tremendous power over the claims of the insured regardless of its legal classification. See id. The Reedy holding embraces a functional rather than a formalistic approach to the tort of bad faith. See id. at 602-03.
The final Iowa bad faith case is *632 Bremer v. Wallace , 728 N.W.2d 803, 804 (Iowa 2007). In Bremer , we considered a case where a workers' compensation claimant asserted a bad-faith claim against an employer who did not have a workers' compensation carrier and was not self-insured under Iowa's workers' compensation statute. Id. at 803-04. Here, the employer was not acting as an insurance company in evaluating and adjusting claims. Id. at 805-06. It was a naked entity with no insurance dimension. Id. The company plainly was not acting as the functional equivalent of an insurer , and for that reason, the tort of bad faith was not available. Id.
In Bremer , we took a functional approach. Id. We explained that in Boylan we recognized the tort of bad faith because the self-insured employer was "the substantial equivalent of an insurer." Id. at 805. Yet in Bremer the adhesive nature of an insurance contract was not involved. Id. at 806. Further, we observed that the claimant could have foregone workers' compensation entirely and brought an ordinary civil action for damages against the employer. Id.
IV. Discussion.
In order to resolve the question before us, we must consider whether the notion of privity should be a bar to bad-faith claims against third-party administrators. We must also determine whether bad-faith claims against a third-party administrator can arise only expressly or by implication from a statute. If the answer to these preliminary questions is no, we must then determine whether the tort of bad faith applies to third-party administrators, and if so, in what settings.
It is clear to me that the question of privity is no bar to the bad-faith claim asserted in this case. In the workers' compensation context, the claim that privity exists between an employee and the employer's insurance carrier has always been a legal fiction. What is important in a bad-faith claim is the functional relationships that arise from insurance relationships, not privity of contract. See, e.g. , Cary , 68 P.3d at 466-68 ; Wolf , 50 F.3d at 797-98 ; Wathor , 87 P.3d at 562-63 ; Dellaira , 102 P.3d at 115. Where third-party intermediaries have the power to affect the insurance interests of the claimant, they should be answerable in tort for their bad-faith actions.
We have seen this movie before. The " 'citadel' of privity" was vigorously defended in products liability cases even though the formal structure of the law did not comport with reality. Stempel, 15 Conn. Ins. L.J. at 605. In MacPherson v. Buick Motor Co. , 217 N.Y. 382, 111 N.E. 1050, 1051-55 (1916), Justice Cardozo cut through the privity doctrine to allow injured parties to directly attack the underlying tortfeasor in a product liability case, namely, the product manufacturer. Cardozo teaches us to see through the formalism of privity and address the realities on the ground to establish direct claims against those responsible for foreseeable injuries to innocent third parties. See id.
Because it is based on power relationships and the foreseeability of harm to the insureds, a claim of bad faith sounds in tort, not in contract. There are ample reasons to impose tort liability for bad-faith performance by a third-party insurance administrator. The power imbalance is just as great, and perhaps greater, as between an insurance company and the insured. Surely it is reasonably foreseeable that the insured will suffer potentially significant injury as a result of poor handling of a claim. If the third-party administrator performs the critical functions of an insurer-adjustment of claims with a financial incentive to delay or deny payments-a bad-faith claim should lie regardless of a web of formal documentation attempting to create artificial barriers between the insured *633 and the people actually deciding their fate. It is "the logic of tort law," not contract, that gives rise to the bad-faith tort against insurance intermediaries. Stempel, 15 Conn. Ins. L.J. at 695.
An insurance intermediary "in essence stepped into the shoes of the insurer for these claims and thus logically should be held to the same legal standards governing the insurer." Id. at 624. Further, there is ample authority to hold the agent liable for its torts. The Restatement (Third) of Agency section 7.01 (2006) provides,
An agent is subject to liability to a third party harmed by the agent's tortious conduct. Unless an applicable statute provides otherwise, an actor remains subject to liability although the actor acts as an agent or an employee, with actual or apparent authority, or within the scope of employment.
It seems to me there is ample reason to recognize a bad-faith tort where an insurance intermediary has the broad discretion to handle an insurance claim, where the harm to the insured from a bad-faith treatment of the claim is foreseeable, and where the intermediary acts with Professor Stempel's list of bad-faith practices: misrepresentation, dishonesty, deceit, gross negligence, recklessness, or sharp practices. Stempel, 15 Conn. Ins. L.J. at 715.
Another factor that drives me toward the conclusion that the tort of bad faith liability for insurance intermediaries should be recognized is the perverse incentives that can arise from the relationship between the insurer and the intermediary. The insurance company hires an intermediary to save money, of course. The intermediary will desire to maintain or strengthen its business, and that can be done by limiting claims payouts. Further, in order to be competitive, the insurance intermediary may resist proper claims handling and instead choose to arbitrarily limit its staff, thereby encouraging shortcuts in the claims process. Further, through use of a third-party intermediary, an insurer may maintain a warm public relations posture while intentionally employing a third-party administrator with the expectation that its agent will limit payouts through whatever means the agent might consider effective. These risks are further enhanced when compensation arrangements contain incentives that increase payouts as claims liability lessens. The interests of the insured do not figure into the financial equation, or at least not in a positive way.
There is nothing in our caselaw that precludes recognizing a bad-faith tort where an insurance intermediary is the functional equivalent of the insurer. None of our caselaw addresses the issue, and the mere fact that a tort was found under the facts presented in Dolan , Boylan , or Reedy does not preclude the finding of a bad-faith tort in a somewhat different context. We employed a functional approach in Bremer , where we declared that because a naked employer was not "the substantial equivalent of an insurer," the bad-faith tort would not lie. 728 N.W.2d at 805. The converse should also be true, namely, that where a third-party administrator is the substantial equivalent of an insurer, a bad-faith tort should lie. See 1 Jeffrey W. Stempel, Stempel on Insurance Contracts § 10.02[A], at 10-17 (3d ed. 2006) ("The key determinant is whether the third party administrator is both acting like an insurer and subject to the danger that it will, like an insurer acting in bad faith, place its own economic interest ahead of the interests of the policyholder."), as cited in Robertson Stephens, Inc. v. Chubb Corp. , 473 F. Supp. 2d 265, 275 (D.R.I. 2007) (adopting functional approach in predicting Rhode Island law).
*634 And, I do not think our caselaw somehow limits potential third-party claims to cases where obligations arise under workers' compensation statutes. In Boylan , the court cited affirmative duties under the statute of employers and insurers to provide medical benefits. 489 N.W.2d at 743. But the reference does not mean that bad-faith torts arise only when statutes support them. Indeed, the first party bad-faith claim in Dolan was not based on statutes. 431 N.W.2d at 794. Further, the Boylan court's citation of "well-reasoned cases" where bad-faith claims were found independent of the workers' compensation statutes cuts dead against reading some kind of statutory requirement into Boylan . 489 N.W.2d at 743. We should not assume that the references to "well-reasoned cases" in Boylan were that negligent. In any event, it has been the duty of common law courts to develop the scope of tort law and apply it in new contexts as circumstances change, not fossilize it as if the goal were placement in a legal history museum.
The majority stresses that an insurance company cannot delegate its duty to act in good faith and that the insurance company remains liable for the bad-faith actions of its agent. But tort law functions better if the person directly responsible for bad-faith acts is financially responsible for resulting damage.
It is consistent with encouraging responsible conduct by individuals to impose individual liability on an agent for the agent's torts although the agent's conduct may also subject the principal to liability. Moreover, an individual agent, when liable to a third party, may be available as a source of recovery when the principal on whose behalf the agent acted is not.
Restatement (Third) of Agency § 7.01 cmt. b (2006). As noted by Professor Stempel, "It is discordant for the law to impose substantial obligations and potential liability on insurers as principals but then to simultaneously prohibit actions against their agents, agents who often have independent, almost unsupervised authority over the claims process." Stempel, 15 Conn. Ins. L.J. at 705. Further, a fact finder might find the degree of culpability for punitive damages to be greater against a third-party administrator who directly caused the problem rather than for an insurance carrier who is simply inattentive to the claims adjustment process performed by its agent.
I recognize, of course, that there is tired authority to the contrary. Much of it reflects older law that simply repeats legal formulas. Some of it seems oblivious to the basic tort principle that persons who are closest to wrongful conduct should be accountable to the wronged party for maximum deterrence.
Among the weakest cases rejecting a bad faith claim against third-party administrators is Sanchez . The Sanchez court compared liability of insurance intermediaries to auditors, 84 Cal.Rptr.2d at 801-02, but the analogy is off the mark. Here, we are not dealing with endless liability to unknown persons, but only liability to claimants or policy holders who are well known to the insurance intermediary.
Further, the claim of conflicting loyalties has been subject to criticism. The Sanchez court stated that since "[a]n adjuster owes a duty to the insurer who engaged him[,] [a] new duty to the insured would conflict with that duty, and interfere with its faithful performance. This is poor policy." Id. at 802. According to Professor Stempel,
Actually, it is poor analysis by the court. The claims adjuster represents the insurer. By law, the insurer cannot give regard only to its own interests; it must not only consider the interests of the policyholder but give them at least "equal" consideration, a legal rule internalized *635 in the custom and practice of insurance (where adjusters frequently describe their role as being required to "look for coverage" rather than "look for reasons to deny coverage"). The adjuster, like the insurer, therefore already has obligations to the policyholder. By immunizing the adjuster from a damages action, the Sanchez Court merely deprived the policyholder of a legal right that it already possessed, i.e., a right to have the adjuster act in the same manner as the insurer is required to act.
Stempel, 15 Conn. Ins. L.J. at 665-66.
In conclusion, one of the features of life in the 21st century is the increased bureaucratization and compartmentalization of business practices that, if accepted as legal barriers, tend to prevent direct accountability for wrongful conduct. Layers upon layers of bureaucracy impair responsiveness. In the workers' compensation arena, the employer hires an insurer and now the insurer in turn may hire a third-party administrator.
But where there is no direct accountability, service may deteriorate. We all know the potential scenario. The phone rings and no one answers. One is put on hold for hours. The right hand knows not what the left hand is doing. No one is familiar with the file. A person with decision-making authority cannot be found. Delay. Delay. Delay. This type of behavior could lead to bad-faith exposure of an insurance company. The exact same type of behavior should lead to bad-faith exposure when a third-party administrator assumes the functions of the insurer.
I can think of no other area where it is more critical to have direct accountability than in insurance-where issues of extraordinary importance and urgency to the insured are increasingly handled by faceless and insulated third-party bureaucracies. To me, one of the essential functions of our tort system is to ensure that parties responsible for the foreseeable injuries that they cause through their misconduct, particularly those done in bad faith, are held directly accountable.
V. Conclusion.
For the above reasons, we should recognize a potential bad-faith claim against third-party administrators in the insurance context when they, in essence, undertake the essential functions of an insurance company as alleged in this case. This ordinarily requires a fact-based determination. I would so answer the certified question in this case.
Wiggins, J., joins this dissent.

Similar loose language about a "joint venture" was utilized in Albert H. Wohlers & Co. v. Bartgis , 114 Nev. 1249, 969 P.2d 949, 959 (1998) (per curiam). Like Sparks , the case does not appear to apply traditional joint venture requirements. See id. As noted by Professor Stempel, when the language is peeled back, the Nevada Supreme Court
appears to be saying that where an intermediary acting within its authority makes a key coverage decision in place of the insurer, the intermediary should be liable like an insurer, particularly if the intermediary has economic incentives adverse to coverage and is involved in significant administrative operations for the insurer.
Stempel, 15 Conn. Ins. L.J. at 643 n.94.